SHEPHERD, FINKELMAN, MILLER
   & SHAH, LLP
JAMES C. SHAH
NATALIE FINKELMAN BENNETT
475 White Horse Pike
Collingswood, NJ 08107
Telephone: 856/858-1770
Facsimile: 856/858-7070
jshah@sfmslaw.com
nfinkelman@sfmslaw.com

Additional Counsel on Signature Page

Attorneys for Plaintiff

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| Q+FOOD LLC, on behalf of itself and all others similarly situated,<br><br>                     Plaintiff,<br><br>   v.<br><br>MITSUBISHI FUSO TRUCK OF AMERICA, INC.,<br><br>                   Defendant. | No.<br><br>CLASS ACTION COMPLAINT<br><br><u>JURY TRIAL DEMANDED</u> |

Plaintiff, Q+Food LLC ("Plaintiff" or "Q+Food"), a Florida limited liability

company wholly owned by Joyelle Yun-Hsuan Fleites and Eduardo Fleites,

husband and wife, and both residents of Florida, by its designated attorneys,

individually and on behalf of all others similarly situated, for its class action

Complaint, alleges as follows based upon personal knowledge, the investigation of its counsel, information and belief, and publicly available information:

## NATURE OF THE ACTION

1.      This is a breach of warranty class action arising from Defendant, Mitsubishi Fuso Truck of America, Inc.'s ("Defendant" or "MFTA"), repeated failure and inability to deliver a conforming, non-defective FE125 truck, VIN No. JL6AME1A5CK000587, causing the warranty to fail of its essential purpose and constituting a model-wide breach of contract.

2.      Upon information and belief, in October 2009 Defendant MFTA issued a press release from its Logan Township, NJ, headquarters, announcing that "its EPA 2010-emissions compliant commercial trucks will use engines equipped with BlueTec® technology developed by Mitsubishi Fuso and Daimler AG. BlueTec® is an emissions control technology that utilizes selective catalytic reduction ("SCR") to reduce nitrogen oxide (NOx) emissions for clean, efficient operation."  http://www.mitfuso.com/en-US/News/2009/11/bluetec-engines-used-in-medium-duty-trucks.

3.      As designed, adapted and installed on the diesel-powered, medium duty trucks sold by Defendant, however, BlueTec® technology has rendered the trucks defective.  Among other things, the technology has resulted in the repeated failure of the Diesel Exhaust Fluid ("DEF") handlers, the fuel injectors, the crank

case pressure sensors and breather, the catalytic converter muffler, the DEF tank internal sensor, the engine protection system, the EEC programming, as well as a lack of power, and numerous other problems that have caused the trucks to stall or not restart.  In short, all medium duty trucks with the BlueTec® technology sold by Defendant have manifested a model-wide defect causing operational failures about which purchasers throughout the country have continuously complained.

4.      These defects and others have been so extensive as to render the trucks sold by Defendant equipped with the BlueTec® technology inoperable for prolonged periods of time, thus costing their owners thousands of dollars in replacement vehicle costs, lost deliveries and work, and back-up trucking expenses.  For example, Plaintiff's truck was out-of-service for at least 250 days of the 790 days in which Plaintiff has owned the truck.  Other owners have experienced similar out-of-service rates, such as "91 days [out-of-service] in the first year after delivery," together with numerous uncompleted repairs.

5.      Shortly after the Environmental Protection Agency ("EPA") announced heightened emission standards, Defendant rushed to production the FE 125 with BlueTec® technology in an effort to sell an "advanced emissions vehicle" to capture market share.  The materials and workmanship of the FE 125 with BlueTec® technology, however, were defectively designed, tested, assembled and

manufactured, resulting in a uniformly defective truck that essentially shuts down unexpectedly and without apparent reason.

6.      This suit is brought on behalf of Plaintiff and all other purchasers of Defendant's diesel-powered, medium duty trucks using engines equipped with BlueTec® technology for breach of warranty, breach of the duty of good faith and fair dealing, violations of the New Jersey Consumer Fraud Act, and declaratory relief under the Declaratory Judgment Act.

7.      As a result of these violations, this action seeks, among other things, damages from loss of warranty investment value, replacement and repair damages, back-up rental and use costs, diminution in value, lost work and other consequential damages, treble damages, interest, and reasonable attorneys' fees and costs.

## PARTIES

8.      Plaintiff is a Florida limited liability company wholly owned by two Florida residents, Joyelle Yun-Hsuan Fleites and Eduardo Fleites.  Plaintiff is in the business of wholesale seafood sales and delivery and maintains its principal place of business at 820 NE 42nd Street, Ft. Lauderdale, Florida.

9.      Defendant is a Delaware corporation with its principal place of business at 2015 Center Square Road, Logan Township, NJ 08085.  MFTA is the North American distributor and warrantor of diesel-powered, medium duty

4

cabover trucks through more than 200 dealer locations throughout the United States, Canada, Puerto Rico and Guam. MFTA is a wholly-owned subsidiary of Mitsubishi Fuso Truck and Bus Corporation, Kawasaki, Japan, which is an integral part of the Daimler Trucks Division of Daimler AG.

## JURISDICTION AND VENUE

10.    This Court has subject matter jurisdiction under the Class Action Fairness Act ("CAFA"), codified in various parts in 28 U.S.C. § 1332(d) and § 1446(a). This class action involves over 100 putative Class members; the members of the class are citizens of a state different from the Defendant; and the aggregate amount in controversy exceeds $5 million (exclusive of costs and interest). On information and belief, during the proposed class period, Defendant sold over 5,000 diesel-powered, medium-duty cabover trucks to members of the class, including Plaintiff. Because 28 U.S.C. § 1332(d)(10) deems an "unincorporated association" such as an LLC to be a citizen of the state where it has its principal place of business and of the state under whose laws it is organized, this action meets the minimal diversity requirements of CAFA because Defendant is a citizen of New Jersey and Delaware, while Plaintiff is a citizen of Florida.

11.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because Defendant has its principal place of business in Logan Township, NJ, and directs

all of its operations, including warranty administration and product press releases, from that location.

## FACTUAL ALLEGATIONS

12.     In order to meet the EPA 2010 Emission Standard applicable to on-highway diesel engines, MFTA designed, manufactured, sold for profit, and warranted the BlueTec® technology Engines (hereinafter "BlueTec® Engine(s)" or "Engine(s)") with an exhaust emission control system containing integrated components intended to reduce air pollutants, in particular, oxides of nitrogen (NOx) and particulate matter (PM), to levels not to exceed those set by the 2010 Standard.  The exhaust emission control system employed by MFTA consists of three primary elements with supporting components and control software: (i) the Diesel Particulate Filter ("DPF"); (ii) the After-treatment Regeneration Device ("ARD"); and (iii) the Electronic Control Unit ("ECU").  Plaintiff's claim is that the defect, which was and is known to Defendant, causes a vehicle to not function as required under all operating conditions, on a consistent and reliable basis, even after repeated warranty repairs and replacements. These repeated warranty repairs and replacements fail to repair or correct the defect resulting in damages, including, *inter alia*, loss of warranty investment value, diminished value of the vehicles powered by the Engines, and the costs to re-power the vehicles with diesel engines that are compliant with the EPA 2010 Emission Standards.

13.     The Clean Air Act ("the Act"), 42 USCA ¶¶ 7521-7551, provides the framework for the regulation of emissions from motor vehicles and engines operated in the United States.  Section 7521(a)(1) provides that the EPA shall, by regulation, "prescribe…standards applicable to the emissions of any air pollutant from any class or classes of new motor vehicles or new vehicle engines…whether such vehicles and engines are designed as complete systems or incorporate devices to prevent or control such pollution." Section 7521(a)(3)(A)(i) provides:

> that "regulations under paragraph (1) of this subsection applicable to emissions of hydrocarbons, carbon monoxide, oxides of nitrogen, and particulate matter from classes or categories of heavy duty vehicles or engines manufactured during or after the model year 1983 shall contain standards which reflect the highest degree of emissions reduction achievable through the application of technology which the Administrator determines will be available for the model year to which such standard apply."

14.     Section 7521(m) of the Act provides for regulations regarding the use of emission control diagnostics (referred to as "On Board Diagnostics" or "OBD") capable of "(A) accurately identifying … emission-related systems deterioration or malfunction, including, at a minimum, the catalytic converter and oxygen sensor, which could cause or result in failure of the vehicles to comply with emissions standards…(B) alerting the vehicle's owner or operator to the likely need for emission-related components or systems maintenance…(C) storing and retrieving

fault codes…and (D) providing access to stored information in the manner

specified by the administrator."[1]

15.    Section 7541(a)(1) of the Act requires that the:

"[M]anufacturer of each new motor vehicle and new motor engine shall
warrant to the ultimate purchaser and each subsequent purchaser that such
vehicle or engine is (A) designed, built, and equipped so as to conform at the
time of sale with all applicable regulations under section 7521 of this title,
and (B) free of defects in materials and workmanship which cause such
vehicle or engine to fail to conform with applicable regulations for its useful
life (as determined under section 7521(d) of this title)."

16.    In compliance with the mandate of the Act, on January 18, 2001, the

EPA issued its Final Rule-Control of Air Pollution from New Motor Vehicles:

Heavy-Duty Engine and Vehicle Standards and Highway Diesel Fuel Sulfur

Control Requirements ("Final Rule"), effective March 1, 2001.[2]  The Final Rule

states:

"We are establishing a comprehensive national control program that will
regulate the heavy-duty vehicle and its fuel as a single system. As a part of
this program, new emissions standards will begin to take effect in model
year 2007, and will apply to heavy-duty highway engines and vehicles.
These standards are based upon the use of high efficiency catalytic exhaust
emissions control devices or comparably effective advanced technologies.
Because these devices are damaged by sulfur, we are also reducing the level
of sulfur in highway diesel fuel significantly by mid-2006." Federal Register

---

[1] Subsection (m) provides for OBD on light duty vehicles, but the subsection
further states:  "The Administrator may, in the Administrator's discretion,
promulgate regulations requiring manufacturers to install such on board diagnostic
systems on heavy duty vehicles and engines."  40 CFR § 86.007-17.

[2] The 2007 EPA Emission Standard for 2007 and after Heavy-Duty Diesel Engines
is at 40 CFR § 86.007-11.

/ Vol. 66, No. 12 / Thursday, January 18, 2001 / Rules and Regulations, Final Rule p. 5002.

17.     The EPA 2010 Emission Standard is an on-highway, diesel emission standard so as to "provide engine manufacturers with the lead time needed to effectively phase-in the exhaust emissions control technology that will be used to achieve the emission benefits of the new standard." *Id.* at 5002.

18.     In promulgating the standards, the Agency found:

"We estimate that heavy duty trucks and buses today account for about one-third of nitrogen oxides emissions and one-quarter of particulate matter emissions from mobile sources…This program will reduce particulate matter and oxides of nitrogen emissions from heavy duty engines by 90 percent and 95 percent below current standard levels respectively." *Id*. at 5002.

19.     The EPA standards regulate both diesel vehicle/engine emissions and diesel fuel standards simultaneously, as a single system:

"These options will ensure that there is widespread availability and supply of low sulfur diesel fuel from the very beginning of the program, and will provide engine manufacturers with the lead time needed to efficiently phase-in the exhaust emissions technology that will be used to achieve the emissions benefits of the new standards." Id. at 5002.

20.     The EPA standards set not-to-exceed standards for Oxides of Nitrogen ("NOx"), Non-Methane Hydrocarbons ("NMHC"), Non-Methane Hydrocarbon Equivalent, Carbon Monoxide, and Particulate ("PM").

21.     The Act requires the EPA to set standards which "reflect the greatest degree of emissions reductions achievable through the application of technology…

9

available for the MY to which the standard applies." *See* Act, Sec. 7521(a)(3). In

this regard, the EPA concluded that:

•      "[T]he development of diesel emissions control technology has advanced in recent years so that very large emission reductions (in excess of 90%) are possible. Especially through the use of catalytic emission control devices installed in the vehicle exhaust system and integrated with the engine controls. These devices are often referred to a 'exhaust emission control' or 'aftertreatment' devices…To meet the new standards, application of high-efficiency exhaust emission controls for both PM and NOx will be needed." *Id*. at 5007.

•      "[S]everal exhaust emission control devices have been or are being developed to control harmful diesel exhaust pollutants. Of these we believe the catalyzed diesel particulate filter and the NOx absorber are the most likely candidates to be used to meet the very low diesel exhaust emission standards adopted today." *Id*. at 5036.

•      "Like the new PM standard, the new NOx standard is projected to require the addition of a highly efficient NOx emission control system to diesel engines which, with the help from the PM trap will need to be optimized to control NMHC emissions." *Id*. at 5036.

22.    The EPA contemplated that exhaust emission control was necessary

for compliance with the emission standards so as to be a "complete emission

control system" integrated with on-board diagnostics:[3]

•      "The Complete System: We expect that the technologies described above would be integrated into a complete emission control system as described in the final RIA. The engine-out emissions will be balanced with the exhaust emission control package in such a way that the results are the most beneficial from a cost, fuel, economy, emissions standpoint." *Id*. at 5054.

_____

[3] Regulatory Impact Analysis EPA42000-010, July 2000, p. 21:  Because these future emission control strategies will rely on electronic controls for adequate performance, EPA expects that the best available on-board diagnostics will be implemented to ensure that these strategies remain effective in-use."

- "The manufacturers are expected to take a system approach to the problem of optimizing the engine and exhaust control systems to realize the best overall performance possible." *Id.* at 5090.

23. "Reliability" of the exhaust emission control system is defined by the EPA as "the expectation that emission control technologies must continue to function as required under all operating conditions for the <u>life of the vehicle</u>." *Id.* at 5056 (emphasis added).

24. "After-treatment" refers to the treatment of exhaust, *i.e.*, pollutant reduction after the exhaust leaves the Engine.

25. "Regeneration" is the "burning off of collected PM (oxidation of the stored PM releasing CO2)." *Id.* at 5047.

## DEFENDANT'S EXHAUST EMISSION ("AFTERTREATMENT") CONTROL SYSTEM

26. After the EPA's announcement of the 2010 standard, Defendant made the business decision to investigate, design, manufacture, warrant and sell for profit diesel engines and trucks using BlueTec® Engines that it said complied with all of the requirements of the EPA 2010 Emission Standard.

27. In its October 21, 2009 Press Release announcing the new Engines, Leighton Good, MFTA's manager of product and applications, said: "BlueTec® SCR represents an excellent solution for [MFTA's] customers to meet EPA 2010 emissions regulations. . . . It is a proven, easy-to-use technology designed to increase fuel economy while protecting the environment." In addition, Mr. Good

11

explained in the Press Release, that "BlueTec® SCR has been in commercial operation in Europe since 2005, with 250,000 vehicles sold so far, most running in Europe." He is directly quoted in the Press Release, stating: "'We know exactly how the technology functions over time, and we're confident it will provide our trucks with unparalleled operational stability and reliability.'"

28.     MFTA marketed the BlueTec® Engines as a better alternative to the systems installed by other truck engine manufacturers to comply with the new EPA regulations.

29.     MFTA's representations about the BlueTec® Engines proved to be wrong. The defect put extreme and harmful pressure on the Engine, resulting in regular and catastrophic failures of the Engines.

30.     Defendant also touted that the expected life of the after-treatment unit was equal to the life of the Engine itself and better than competing technologies: "With BlueTec® technology, exhaust gas recirculation can actually be reduced, improving engine efficiency. In addition, the regeneration interval of the diesel particulate filter is extended, requiring less fuel to burn off soot collected by the filter. The combination of these innovations is improved fuel economy, compared to EPA 2007-compliant engines with comparable ratings, under the same operating conditions and loads. A DEF gauge will be integrated into the instrument panel, to allow the driver to readily monitor DEF tank level. In addition, on-board

12

diagnostics will monitor the function of the emissions system to maintain EPA

2010 compliance and immediately communicate system status to the driver."

31.    As trumpeted by Defendant's Press Release:  BlueTec® emissions

technology "provides full emissions compliance by treating the downstream

exhaust gas.  The system consists of components already introduced to meet EPA's

2007 emissions regulations (the diesel particulate filter, or DPF, the diesel

oxidation catalyst, or DDC), plus SCR catalyst and diesel exhaust fluid (DEF)

tank, doser and control module.  During operation, the DEF doser atomizes and

sprays small, carefully regulated amounts of diesel exhaust fluid into the exhaust

stream.  Once in the SCR catalyst, the NOx in the exhaust gas reacts with the DEF

to form water and nitrogen – both harmless components of the air we breathe."

32.    However, contrary to the express expectation of the EPA regulations,

MFTA's BlueTec® Engines insufficiently catalyzed emissions, periodically

requiring active regeneration to increase exhaust temperatures needed to burn off

the filter.

33.    As noted in the Press Release, the operation of the BlueTec® SCR, as

necessary to meet the Clean Air Act On Board Diagnostic ("OBD") requirements,

uses monitoring and diagnostic sensors and the Electronic Control Unit ("ECU")

software to regulate and monitor the operation of the DPF and DOC so as to ensure

that the engine exhaust has sufficiently reduced pollutants to the level mandated by the EPA 2010 emissions standard.

34.     The ECU is a comprehensive, programmable engine monitoring system. It continuously monitors engine operating conditions, controls particulate emissions, interfaces with the vehicles' sensor inputs, and performs the fault detection and diagnostic reporting requirements for OBD. The ECU monitors all of the systems of the Engine, including the exhaust emissions controls - "Operating conditions of the After-treatment Regeneration Device (ARD)" and the "Operating conditions of The Diesel Particulate Filter." In response to operating conditions, the ECU is programmed to provide one of the following levels of response to operating conditions: (1) Warning; (2) De-rate; or (3) Shutdown.

- • "Warning" advises the driver that action must be taken or the ECM will proceed to shut down.

- • "De-rate" means that the ECM de-rates the engine's performance (reduces horsepower) in order to get the driver's attention so the driver can take action in order to avoid engine damage.

- • "Shutdown" means that the ECM takes action necessary to shut down the engine within a short period to allow the driver to get off the road.

In all instances, the event is logged and the vehicle requires immediate authorized maintenance.

35.     The ECU's software determines if the BlueTec® SCR is operating correctly, detects faults in BlueTec® SCR operation, activates diagnostic trouble codes, and controls engine operation, including activating warning, de-rating, and

shutdown functions. In much the same way as an engine automatically adapts to airflow needs, the ECU interfaces with the vehicle to receive sensor input, compare the input to programmed operational parameters, and provide output which is converted into mechanical responses. In particular, the ECU monitors the BlueTec® SCR after-treatment and pressure sensors to determine when regeneration of the DPF is required, whether regeneration occurs, and whether warning, de-rating, and/or engine shutdown is necessary due to BlueTec® SCR failure. If working correctly, the result is an efficient integration of exhaust emission control under all operating conditions. The basis of Plaintiff's claims is that the BlueTec® SCR, and in turn, the entire emissions and regeneration system, does not and cannot function efficiently and reliably.

36.    In addition to monitoring the efficient operation of the Engine's various systems, the ECU logs and stores "Active Codes," "Logged Diagnostic Codes," and "Logged Event Codes" by the number of occurrences within a specified Engine operating time (the cumulative time of engine operating hours), as well as other Engine and SCR data.

37.    The ECU has the ability to detect problems and initiate warning, de-rate, and shutdown responses when the specific fault detected is of such severity as to require action. Some codes indicate problems with the monitoring sensors themselves, and may not require any action; some may be intermittent, while

15

others indicate undesirable operating conditions, like failure of the BlueTec® SCR to regenerate. When operating codes occur, the codes are "active," meaning that the condition giving rise to the code is currently existing and in need of further diagnosis and likely remediation.

38.    Upon information and belief, the ECU fault detection function is quantified by a corresponding numeric "code." Some codes relate to the fault detection of the BlueTec® SCR, and others relate to other systems in the Engine. When a fault in the operation of any part of the BlueTec® SCR threatens the integrity of the Engine, the Engine shuts down entirely.

39.    The ECU is responsible for both fault detection and fault reporting. As a result, when a truck is shut down, de-rated, or a warning lamp illuminated, as indicated previously, the ECU records and stores this information. When the vehicle is brought in to an MFTA-authorized dealer for emissions warranty repair for a BlueTec® SCR failure, it can be identified by accessing the ECU stored data.

40.    Because of the significant hazard resulting from a BlueTec® SCR regeneration failure, the Engine contains a program which determines the Engine's response to this failure. The ECU activates the OBD to issue a warning to the operator, or automatically de-rate, or shutdown the Engine.

41.    In the event of de-rate or a shutdown, the truck is no longer able to operate safely on the highway until authorized maintenance is performed.

16

42.    In the event of a BlueTec® SCR OBD warning, de-rate, or shutdown, the truck can no longer operate and must be taken in for repair at an authorized MFTA facility. This means that for a truck in operation, the truck that shut down must be towed in for repair, and the truck is then unusable for that period of time.

43.    The BlueTec® SCR repeatedly and frequently experiences warning, de-rate, and shutdown commands issued by the ECU as a result of fault detection, which cause the trucks to require immediate authorized exhaust emission control diagnoses, and remediation, during which time the trucks are out of service.

## PLAINTIFF'S AND THE CLASS'S EXPERIENCE

44.    Upon information and belief, the design, modification, installation and decisions regarding the Engines within Plaintiff's and Class members' vehicles were performed exclusively by MFTA. Further, MFTA created the BlueTec® SCR so that it could not be disabled or bypassed in any way by anyone other than an MFTA-authorized technician.

45.    Defendant developed the owner's manuals, warranty booklets and information included in maintenance and repair recommendations and/or schedules for the Engines and the vehicles at its headquarters in New Jersey.

46.    MFTA provides "The Canter Advantage: Warranty – The Best Medium Duty Truck Warranty."  In summary, it provides:  "Mitsubishi Fuso protects your new truck investment long after competitors' warranties have

17

expired.  We combine 3-year bumper-to-bumper, 4-year rust-through, and 5-year/175,000-mile powertrain limited warranties into the strongest warranty package available on any class 3-5 trucks.  Our 5-year standard powertrain protection leads the industry and is a testament to the longevity you can expect from your new Mitsubishi Fuso vehicle."  Under the 3-Year warranty, MFTA promises:  "For the first 36 months, regardless of mileage, any originally installed components of the truck (excluding batteries, tires, and custom-made rear bodies and accessories), under normal use and maintenance, will be repaired or replaced by an Authorized Dealer, using genuine Mitsubishi Fuso parts, at no charge for parts and labor."

47.    The five-year powertrain warranty covers engine and transmission components such as the "Cylinder Head Assembly and Valve Cover, Oil Pump and Oil Pan, Exhaust Manifold and Intake Manifold . . . Fuel Supply Pump, Common Rail, Injectors and Related Lines, Turbocharger, Water Pump, Starter and Alternator" . . . and transmission components.  Upon expiration of the 36-month/unlimited-mileage warranty, the powertrain warranty "will continue to cover the powertrain components . . . for 60 months or 175,000 miles."

48.    MFTA further provides a "5-Year Emission Control System" warranty that covers the "BlueTec® Emission Control System" and components for the first 60 months, and promises that "any genuine Mitsubishi Fuso parts

18

covered by the MFTA emissions warranty that prove defective in material or workmanship will be repaired or replaced by any Authorized Dealer, using genuine Mitsubishi Fuso replacement parts, at no charge for parts and labor."

49.    Under this warranty, MFTA warranted to all owners and users of its BlueTec® SCR Engines that all emissions related parts and components were designed, built, and equipped so as to conform to the EPA 2010 Emission Standard.  This warranty was required by the federal EPA Emission Standards and, therefore, was uniform and, in turn, subject to uniform standards, principles and applications, based on minimum standards, for both direct and transfer purchasers within the warranty period, throughout the United States.

50.    MFTA expressly warranted to Plaintiff and Class members that the exhaust emission controls of its BlueTec® SCR Engines were free from defects in material and workmanship and, in the event a defect manifested, MFTA was obligated to correct the defect.

51.    Contrary to this warranted representation, the Engine was and is defective, *inter alia*, in that the exhaust emission controls repeatedly and frequently fail to function properly in reducing emission pollutants on a reliable and dependable basis, resulting in repeated fault detection, and failures, causing vehicle shutdown.  The faults resulted in warning, derating, and shutdown, requiring authorized and expensive maintenance to remediate the active fault codes before

19

the trucks can be used, which defects MFTA has been unable to correct in spite of repeated and numerous attempts.

52.　Defendant knew, or should have known, that the Engine's BlueTec® SCR was defective, and that its defects could not be corrected.

53.　In performing emission system and standard warranty repairs, MFTA acknowledges that the BlueTec® SCR failures detected are defects in material and workmanship in the Engines because the emissions warranty repairs are performed.

54.　However, the Engines repeatedly experience failures that are not corrected by the emission warranty work or standard warranty work performed. These repeated and frequent failures cause the vehicles to be unreliable and which, in spite of numerous attempts, the BlueTec® SCR failures have not and cannot be corrected. The numerous and frequent faults cause warning, de-rate, and shutdown, necessitate costly and time-consuming emissions and standard warranty repairs rendering them unreliable and unsafe for transportation because the Engines do not and cannot effectively and reliably remove exhaust emission pollutants as required by the EPA 2010 Emissions Standards on a consistent and reliable basis.

55.　By failing to correct the defects, and in spite of repeated, frequent attempts, Defendant has breached its express written Emissions Warranty, and its express written standard and powertrain warranties. By its conduct, Defendant has also violated its statutory obligations.

56.     Not long after Plaintiff and Class members purchased or leased trucks with the Engines, and within the warranty period of their warranty and/or Emission Warranty, they began to experience numerous failures of the BlueTec® SCR to operate effectively and reliably. This caused Plaintiff and Class members to incur significant damages, including the lost investment value of the warranty and diminution of the value of their trucks.

57.     Plaintiff's Engines detected numerous and various faults in the operation of the BlueTec® SCR, which triggered warning, de-rating, and shut down necessitating delivery of the vehicles to an authorized MFTA repair facility for emissions warranty work.

58.     In spite of repeated emissions warranty work on the BlueTec® SCR, Plaintiff and members of the class experienced repeated instances of warning lights illuminating, Engine de-rating and shutdown, after-treatment regeneration devices plugging and/or clogging, and DPF regeneration failure, as well as a myriad of system failures that prevented the Engines from properly regenerating.

59.     Despite Defendant's numerous attempts to correct BlueTec® SCR failures, the Engine exhaust emission controls do not function as required under all operating conditions, and will not do so for the expected life of the vehicle.

60.     Defendant represented to Plaintiff and Class members that each warranty repair would correct the defect; but after repair, Plaintiff and Class

21

members continue to experience defective exhaust emission control, when MFTA knew, or should have known, that the defects could not be corrected.

61.     Although many Engines are still in service and Defendant had promised to back them with the proper service, this has not happened.

62.     In addition, authorized service centers are unable to obtain the necessary parts from Defendant, despite its warranty obligations, such that some authorized service centers are unable to service the Engines.

63.     Plaintiff and Class members have suffered substantial financial losses and other damages as a result of Defendant's actions and the defective Engines.

**Plaintiff Q+Food**

64.     Q+Food purchased a new 2012 FE 125, VIN No. JL6AME1A5CK000587, on July 22, 2011 from MFTA's authorized dealer, Tri-County Truck & Equipment in Pompano Beach, Florida.

65.     Within the first month, on August 22, 2011, the truck shut down and failed to regenerate, requiring service by Tri-County to make the truck operable. The truck was not available until August 24, 2011.

66.     On September 6, 2011, the same defect manifested, again requiring service to make the truck operable.  The truck was not available until September 13, 2011.

67.     On October 4, 2011, at a mileage of 7,070, the same emissions system defect occurred again, also requiring service to make the truck operable.  The truck was not available until October 11, 2011.

68.     On June 13, 2012, the check engine light went on indicating that the SCR was "out-of-perimeter," again requiring service by Tri-County.

69.     On July 12, 2012, the check engine light again stayed on due to "inoperable crankcase pressure sensors."  Service was again required, where Tri-County had to "manually regenerate [] DPF system 3 times."  The truck was unavailable until July 23, 2012.

70.     On August 13, 2012, the check engine light again stayed on due to an "internal defect with the catalytic converter muffler."  The truck was unavailable until August 14, 2012.

71.     On April 11, 2013, the check engine light again stayed on, requiring replacement of the "mass air flow sensor and injector line."  The truck was unavailable until April 29, 2013.

72.     On July 18, 2013, the DEF light came on, requiring a "close internal" and manual regeneration.  The truck was unavailable until August 6, 2013.

73.     On November 26, 2013, the check engine light came on and the truck shut down, requiring a tow to the dealer for service.  The technicians "found DEF

internal sensor failure . . . DEF injector crystalized clogged . . . temp gauge failed . . . harness shorted."  The truck was unavailable until November 30, 2013.

74.    On April 2, 2014, Plaintiff had routine and scheduled maintenance and service performed on the truck by MFTA's authorized dealer.

75.    On June 11, 2014, the check engine light went on, requiring manual regeneration, with the technician noting that the "unit may need turbo."  The truck was unavailable until June 12, 2014.

76.    On June 14, 2014, the check engine light went on, but MFTA's authorized dealer could not diagnose the problem, so Plaintiff retrieved the vehicle on June 17, 2014.

77.    On June 21, 2014, the truck would not shift and was locked down. The authorized dealer found that "unit needs a NOx sensor" and manual regeneration.  The truck was not available until July 8, 2014.

78.    In addition to the foregoing repairs and out-of-service periods, the truck was also out-of-service for three recalls required by MFTA: the first on November 28, 2012 – for "engine EEC reprogramming," "Duonic TCM reprogramming," "fuel pressure low return hose," and other matters – taking the truck out-of-service until December 18, 2012; the second on May 29, 2013 – for "EEC reprogramming" – taking the truck out-of-service until June 18, 2013; and

24

the third on April 17, 2014 for "Duonic ATF contamination recall," taking the truck out-of-service until May 31, 2014.

79.     On July 30, 2014, in response to Q+Food's repeated notices and complaints, Joseph P. Watkins, Product Support Manager of MFTA in Logan Township, NJ, sent Plaintiff an email in which he stated, among other things, that "we [MFTA] have come to the determination that no further assistance will be provided at this time."

80.     As a result of this email and the numerous repairs and recalls and the hundreds of days of out-of-service, MFTA's warranty has failed of its essential purpose, as MFTA has not delivered a conforming truck free from defects in material and workmanship, even after performing repairs and replacements.  The repairs and replacements also have been defective, meaning that MFTA has never complied with its warranty promise, and the warranty has failed of its essential purpose, *i.e.* to restore the truck to a non-defective, conforming condition.

81.     Plaintiff and Class members continue to experience Engine failures and repeated and ineffective repairs when Defendant knew, or should have known, that the defects and related Engine failures could not be corrected.

82.     Plaintiff and Class members have suffered substantial financial losses and other damages as a result of Defendant's actions and the defective Engines.

83.     Consistent with Plaintiff's experiences, dozens of consumers have also provided notice to MFTA of the defect described above, both through direct communications and individual lawsuits, and through Internet complaint forums. Set forth below is a sample of some of the Internet complaints:

**Other Consumer Complaints**

A. Ken M [ July 05, 2012 @ 10:45AM ]

We purchased 3 2012 Cannter 160's in Dec 2011. The truck when empty works fine, however, when a load or trailer with load is added the transmission does't know what to do. They all shift from 2-6 in 200' of take off. They won't down shift going up hills. They actually have shut down in the middle of the highway. Japan said they were aware of problems, sent a representative to evaluate. They were going to product an entirely new control module. We haven't heard from them yet The trucks seem to run fine if operated as a standard trans. if your drivers are capable of that, however, we purchased a truck that was supposed to have an automatic trans, and it does't

B. michael [ December 07, 2012 @ 12:35AM ]

brought one of these trucks RUBBISH !!!!!!!!!!! COULD NOT PULL THE SKIN OFF A RICE PUDDING

C. darin [ January 29, 2013 @ 09:30PM ]

emission problems regularly.truck is going to run me out of business from rental costs while in for repairs.

D. adam m [ May 02, 2013 @ 02:56PM ]

Regarding my 2012 Mitsubishi Fuso Canter....
Disaster! Nothing but trouble since day one. Regularly went into limp mode. The transmission was reluctant to downshift when desired, then downshifted when not desired, at uncomfortable-sounding revs. Very hesistant when starting from a full stop. Very slow to shift in manual mode as well. The

check engine light was often on. The dealer(Robert Green, Monticello, NY) was very responsive and professional but nobody could fix the thing. I inquired several times about trading it in for another brand. Then, blessedly, the truck went several months without going into limp mode. But Monday(today's Thursday) as I was driving home from a job, with 19000 miles on the truck, the transmission died, and I coasted to a stop.
The dealer replaced the transmission in two days! But driving back from the dealer yesterday the check engine light was on again, and the transmission was reluctant to downshift in drive, and appeared to be slipping, here and there. I resolved then to get rid of this truck at any cost and started making inquiries about other makes. Today I took the truck out for 20 minutes or so and not only was the check engine light on but the buzzer--the high-pitched sound that, for example, is heard when a door is not fully closed--was on all the time!
The dealer sent a tow truck today with a promise to work on it right away.

E. Kevin LPL [ May 09, 2013 @ 03:30PM ]

Looks like now i'm not to buying a new Fuso FE.. or atleast an automatic.

Does the standard have the same issues?

F. Mike T [ May 13, 2013 @ 04:41PM ]

Problems since day one. We have experienced all of the complaints and problems of the previous posts, shut down in the middle of the interstate (6 times) Check engine light opn constantly, the maddining alarm that comes on, over $3000 in rental cost for down time the numerous times we have had it in to be fixed. They put a new transmission (alledgedly) in Feb 2013...the check engine light AND the alarm came on on the way back to our shop May 8 2013 the truck started slamming into 2nd and 3rd gear and would notgo into reverse, In for another "new" transmission that is suppose to be the fix to the fix to the fix that didnt work by the Best and brightest of the Mitsubishi Engineers.

G. jr [ May 31, 2013 @ 06:28PM ]

nothin but problems with this truck, towed 3 times, dealer replaced trans 3 times, 19000 on this truck, just signed the papers for a new hino, stay far away from the fuso!!!

H. dick n [ August 07, 2013 @ 07:42AM ]

We have seven Fusos in our fleet of twenty-six class five trucks, including 2011 and 12 Fuso models and they are a disaster! We estimate we have lost revenue in the order of $150,000 in the last year solely resulting from down time with the Fusos. It is difficult to believe that in this day and age, such appalling product quality could exist. And, with respected names like Mitsubishi and Daimler Benz behind the Fuso, it's absurd!!!!

I. darin [ September 06, 2013 @ 07:16AM ]

posted 9 months ago truck no better. 167000 kl on transmition number three and constant warning light every day. dealer always ready to fix but truck never really gets fixed. fuso had 50 trucks and 33 technitions in Quebec last winter trying to figure out how to get them to run properly. im now looking for some other brand that is localy serviceable. best truck I ever had was a 2001 hino . put a million km 0 2 of them. shall try canadian motor vehicle arbitration and lawyer to to get fuso to buy back my truck.

J. db0251 [ October 11, 2013 @ 06:41AM ]

Purchased a NEW 2012 FE and have had nothing but problems. replaced 5 transmissions and the 6th one scheduled to be installed. tried to trade it in but no one even the dealer I have purchased trucks from for 10 years. They know it is bad. Trouble with transmissions, computers, fuel system.

K. Neil Sundberg [ December 27, 2013 @ 06:32PM ]

judging by the responses to this article I apparently made a big mistake buying my 2012 Fuso . So what solutions is Mitsubishi working on for this problem? I would think a redesign of the tranny might be in order given the track record of it so far. I have not had any problems so far except that it doesn't seem to always shift down when it should. But it only has less than 3k miles on it. Please feel free to email me . I would like to talk privately with some of you about this and what I might do to avoid issues or at least minimize them

L. Jesse [ March 03, 2014 @ 10:59PM ]

The euro 5 canter is the Biggest price of shit in the world wouldn't have one even if I was given to me with all the engine faults and trans faults

The fuso fighters on the other hand are a bullet prof truck

M. Jesse [ March 03, 2014 @ 11:00PM ]

Price of shit

N. Jesse [ March 03, 2014 @ 11:03PM ]

The euro 5 canter is the Biggest piece of shit the world ATM .. I wouldn't take one if it was given to me .. Fucking shit truck with all the engine and transmission problems..

On the other hand the fuso fighters are a bullet prof truck that I would highly recommend

O. Colleen Trotter [ June 09, 2014 @ 07:03PM ]

Two transmissions now since 2012. Two flush throughs. Wiring harness. Towed three times in limp mode. Eight tows in two years. We have spent so much on DEF fluid on this truck vs. the others. We all need to get together for a class action suit on this truck. It is a lemon for sure. BBB get ready cause here we come. This totally affects our business. We have three locations 1 1/2 hours away from each other and when one of our three trucks go down the other location has to cover if possible. We have lost so much business canceling jobs because the truck went down. By the time we can service a customer they found someone else and have a bad taste in their mouths for junk king. We would have been there with positive reviews and referrals had we not bought a Mitsubishi. Looking at the other reviews it is very clear that the Mitsubishi is pushing this problem into outer space and just willing it away because they may go bankrupt replacing all the lemons they produced in 2012! They will replace our transmissions or flush the transmission 10 times over before getting to the bottom line. Is someone an attorney who can put together a class action suit on our behalf? We need to act. We can't afford to lose our livelihood .

P. Grayson [ July 20, 2014 @ 09:10PM ]

I am a new owner. Ordered, 01-01-14
Finally arrived and picked up, 06-01-14. As of yet, 07-14 it's been in the shop for a clunky shifting transmission more than I have used it. I own a

landscape business, bought this new truck to be our new #1 truck to replace the dinosaur f450.
What a 70k joke and mistake I made buying this piece of junk. It's not equal by any means and now I need to seriously think about jointing this law suite. It is the worst truck I ever have driven. I am waiting on a response from fuso-mits.
Grayson

http://www.worktruckonline.com/article/story/2012/01/mitsubishi-fuso-reinvents-its-fe-fg-cabover-series/page/5.aspx (last visited 9/12/2014).

## CLASS ACTION ALLEGATIONS

84.     Plaintiff brings this action on behalf of itself and all others similarly situated, pursuant to Rule 23 of the Federal Rules of Civil Procedure.

85.     Plaintiff brings this action on behalf of the following class ("Class"):

All individuals or entities in the United States who leased or purchased, not for resale, MFTA trucks having the BlueTec® SCR technology Engine.

Alternatively:  All individuals or entities in Florida who leased or purchased, not for resale, MFTA trucks having the BlueTec® SCR technology Engine.

Excluded from the Class are: (a) Defendant, including any entity in which Defendant has a controlling interest, and its representatives, officers, directors, employees, assigns and successors; (b) any person who has suffered a personal injury or is alleged to have suffered personal injury as a result of using the Engine; (c) any person or entity who has settled or released these same claims against Defendant as evidenced by a written release; and (d) the Judge to whom this case is assigned.

86.     <u>Numerosity/Impracticability of Joinder</u>:  The members of the Class are so numerous that joinder of all members would be impracticable.  The proposed Class includes, at a minimum, thousands of members.  The precise number of Class members can be ascertained by reviewing documents in Defendant's possession, custody and control or otherwise obtained through reasonable means.

87.     <u>Commonality and Predominance</u>:  There are common questions of law or fact which predominate over any questions affecting only individual members of the Class.  These common legal or factual questions, include, but are not limited to the following:

a.      whether Defendant engaged in a pattern of fraudulent, deceptive and misleading conduct;

b.      whether Defendant's acts and omissions violated the CFA;

c.      whether Defendant made material misrepresentations of fact or omitted stating material facts to Plaintiff and the Class regarding the defect in Defendant's Engines;

d.      whether Defendant's false and misleading statements of fact and concealment of material facts regarding the defect in the Engines were intended to deceive the public;

e.      whether Defendant breached its express and implied warranties;

31

f.      whether, as a result of Defendant's misconduct, Plaintiff and the Class are entitled to equitable relief and other relief, and, if so, the nature of such relief; and

g.      whether the members of the Class have sustained ascertainable loss and damages as a result of Defendant's acts and omissions, and the proper measure thereof.

88.     <u>Typicality</u>:  The representative Plaintiff's claims are typical of the claims of the members of the Class it seeks to represent. Plaintiff and members of the Class have been injured by the same wrongful practices in which Defendant has engaged. Plaintiff's claims arise from the same practices and course of conduct that give rise to the claims of the members of the Class and are based on the same legal theories.

89.     <u>Adequacy</u>:  Plaintiff is a representative that will fully and adequately assert and protect the interests of the Class, and has retained class counsel who are experienced and qualified in prosecuting class actions.  Neither Plaintiff nor its attorneys have any interests which are contrary to or conflicting with the Class.

90.     <u>Superiority</u>:  A class action is superior to all other available methods for the fair and efficient adjudication of this lawsuit, because individual litigation of the claims of all Class members is economically unfeasible and procedurally impracticable.  While the aggregate damages sustained by the Class are likely in

32

the millions of dollars, the individual damages incurred by each Class member resulting from Defendant's wrongful conduct are too small to warrant the expense of individual suits. The likelihood of individual Class members prosecuting their own separate claims is remote, and, even if every Class member could afford individual litigation, the court system would be unduly burdened by individual litigation of such cases. Individual members of the Class do not have a significant interest in individually controlling the prosecution of separate actions, and individualized litigation would also present the potential for varying, inconsistent, or contradictory judgments and would magnify the delay and expense to all of the parties and to the court system because of multiple trials of the same factual and legal issues. Plaintiff knows of no difficulty to be encountered in the management of this action that would preclude its maintenance as a class action. In addition, Defendant has acted or refused to act on grounds generally applicable to the Class and, as such, final injunctive relief or corresponding declaratory relief with regard to the members of the Class as a whole is appropriate.

91.    It is both necessary and appropriate to apply the law of Defendant's home state, New Jersey, to all claims herein for at least the following reasons: (i) Defendant developed, issued and administered both the Press Release announcing the BlueTec® technology and the federally mandated uniform emissions warranty from its headquarters in New Jersey; (ii) Defendant expected and intended that the

33

minimum standards applicable to all claims related to the Engines and its warranty would be the standards applicable in New Jersey; (iii) there are no conflicts or inconsistencies between New Jersey law and the laws of other jurisdictions that would make New Jersey standards less protective of lessees and purchasers; (iv) in fact, there are no material differences between New Jersey law and the laws of other jurisdictions given the Uniform Commercial Code sections applicable here and the uniform federally mandated emissions warranty applicable to the claims herein. *See*, *e.g.*, *Peterson v. BASF Corp.*, 618 N.W.2d 821 (Minn. App. 2000).

92.     In addition, a class action pursuant to Rule 23(b)(2) is appropriate with respect to the Declaratory Judgment claim because Defendant has acted or refused to act on grounds that apply generally to the Class, so that final declaratory relief is appropriate respecting the Class as a whole.  In particular, Plaintiff believes and therefore avers that Defendant's Press Release and marketing materials, together with its express warranties, require Defendant to replace all of the Engines and emissions systems in the trucks purchased or leased by Plaintiff and members of the Class with conforming, non-defective Engines and emissions systems and to compensate Plaintiff and Class members for all out-of-service costs arising from or related to the defect.

93.     In the alternative, Plaintiff seeks certification pursuant to Rule 23(c)(4) on the issues of:  a).whether Defendant breached its uniform warranty

34

contracts with Plaintiff and the Class; and (b) whether Defendant engaged in deceptive, confusing or misleading practices in connection with the sale and warranting of the trucks.

## COUNT I
## VIOLATIONS OF NEW JERSEY CONSUMER FRAUD ACT
### (N.J.S.A. § 56:8-1, *et seq.*)

94.     Plaintiff incorporates the allegations set forth above as if fully set forth herein.

95.     Q+Food and Defendant are "persons" within the meaning of the New Jersey Consumer Fraud Act ("CFA").

96.     Q+Food and the members of the Class are "consumers" within the meaning of the CFA.

97.     At all relevant times material hereto, Defendant conducted trade and commerce in New Jersey and elsewhere within the meaning of the CFA.

98.     The CFA is, by its terms, a cumulative remedy, such that remedies under its provisions can be awarded in addition to those provided under separate statutory schemes.

99.     Defendant's practices violated the CFA for, *inter alia*, one or more of the following reasons:

a.      Defendant concealed from Q+Food and the Class the material facts that the Engines were defective and, as such, the vehicles and Engines were

35

not of merchantable quality;

        b.     Defendant engaged in unconscionable commercial practices in failing to disclose material information discussed above about the Engines.

100.    Defendant consciously omitted to disclose material facts to Q+Food and the Class with respect to the defective Engines.

101.    Defendant's unconscionable conduct described herein included the omission and concealment of material facts concerning the defective Engines, as well as the affirmative misrepresentation that the Engines "will provide . . . unparalleled operational stability and reliability."

102.    Defendant intended that Q+Food and the Class rely on its acts of concealment and omissions and misrepresentations, so that Q+Food and the Class would purchase and/or lease the Engines.

103.    Had Defendant disclosed all material information regarding the defective Engines to Q+Food and the Class, they would not have purchased and/or leased the Engines or would have paid less.

104.    The foregoing acts, omissions and practices proximately caused Q+Food and the Class to suffer an ascertainable loss in the form of, *inter alia*, added expense to continuously remove, repair and replace the defective Engines, diminution of value, loss of use of the Engines, as well as towing and other expenses, and they are entitled to recover such damages together with appropriate

36

penalties, including treble damages, attorneys' fees and costs of suit.

105.   In the alternative, to the extent Plaintiff's claims are limited to it and a Class of Florida persons and entities, Defendant has violated the Florida Unfair and Deceptive Trade Practices Act, Fla. Stat. § 501.201, *et seq.*  The foregoing allegations are hereby incorporated by reference.

106.   Pursuant to this Statute, Plaintiff will serve the Florida Attorney General with a copy of this Class Action Complaint, as Plaintiff seeks injunctive and declaratory relief.

**COUNT II**
**BREACH OF EXPRESS WARRANTY**
**(N.J. Stat. Ann. § 12A:2-313)**
**(Alternatively Fla. Stat. § 672.313)**

107.   Plaintiff incorporates the allegations set forth above as if fully set forth herein.

108.   As an express warrantor and manufacturer and merchant, Defendant had certain obligations under N.J. Stat. Ann. § 12A:2-313 to conform the Engines to the express warranties.

109.   When Plaintiff and the members of the Class purchased and/or leased the vehicles with the Engines, Defendant expressly warranted under its warranty that it would repair defects in the Engines.  MFTA also warranted that the Engines would exhibit "operational stability and reliability".

110.   The defect at issue in this litigation was present at the time of sale and

37

lease to Q+Food and members of the Class.

111.   Defendant breached its Emissions Warranty and other express warranties (and continues to breach these  warranties) because it has not and cannot deliver a conforming, non-defective truck to Plaintiff and Class members even after repeated repairs and replacements of component parts.  In addition, Defendant did not (and does not) cover the expenses associated with replacing the defective Engines in Q+Food's and Class members' vehicles. Defendant further breached these express warranties because the same Engines and the same defective emissions and regeneration systems were placed in vehicles during purported repairs.

112.   Pursuant to the express warranties, Defendant was obligated to pay for or reimburse Q+Food and the Class members for out-of-service costs and costs incurred in replacing the defective Engines.

113.   Pursuant to the express warranties, Defendant also was obligated to repair the defective Engines.

114.   Defendant and its authorized agents, the dealers, have failed and refused to conform the Engines to the express warranties and Defendant's conduct, as discussed throughout this Complaint, has voided any attempt on its part to disclaim liability for its actions.

115.   Q+Food used the Engines in a manner consistent with their intended

use and has performed each and every duty required under the terms of the warranties, except as may have been excused or prevented by the conduct of Defendant or by operation of law in light of Defendant's unconscionable conduct described throughout this Complaint.

116.   Defendant received timely notice regarding the problems at issue in this litigation and, notwithstanding such notice, has failed and refused to offer an effective remedy.

117.   In addition, Defendant has received, on information and belief, thousands of complaints and other notices from customers advising it of the defect at issue in this litigation.

118.   In its capacity as a supplier and/or warrantor, and by the conduct described herein, any attempt by Defendant to limit its express warranties in a manner that would exclude or limit coverage for the defect in the Engines that was present as of the time of sale or lease, which Defendant knew about prior to offering the Engines for sale, which Defendant concealed and did not disclose, and did not remedy prior to sale or lease (or afterward), is unconscionable, and any such effort to disclaim or otherwise limit liability for the defect at issue is null and void.

119.   Accordingly, Q+Food and the Class members suffered damages caused by Defendant's breach of the express warranties and are entitled to recover

damages as set forth herein.

## COUNT III
## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
### (N.J. Stat. Ann. § 12A:2-314)
### (Alternatively Fla. Stat. § 672.314)

120.   Plaintiff incorporates the allegations set forth above as if fully set forth herein.

121.   Defendant is and was at all relevant times a merchant with respect to the Engines.

122.   A warranty that the Engines were in merchantable quality and condition is implied by law pursuant to N.J. Stat. Ann. § 12A:2-314.

123.   Defendant impliedly warranted that the Engines were of good and merchantable condition and quality – fit and safe for their ordinary intended use.

124.   The Engines were defective at the time they left the possession of Defendant, as set forth above. Defendant knew of this defect at the time these transactions occurred. Thus, the Engines, when sold and at all times thereafter, were not in merchantable condition or quality and are not fit for their ordinary intended purpose.

125.   By virtue of the conduct described herein and throughout this Complaint, Defendant breached the implied warranty of merchantability.

126.   Q+Food and Class members have been damaged as a direct and proximate result of Defendant's breach of the implied warranty.

40

127.   Q+Food has used the Engines in a manner consistent with their intended use and performed each and every duty required under the terms of the warranties, except as may have been excused or prevented by the conduct of Defendant or by operation of law in light of Defendant's  conduct.

128.   Defendant received timely notice regarding the problems at issue in this litigation and, notwithstanding such notice, failed and refused to offer an effective remedy.

129.   In addition, Defendant has received, on information and belief, thousands of complaints and other notices from customers advising of the defect associated with the Engines.

130.   Q+Food has had sufficient dealings with either Defendant or its authorized dealers to establish privity of contract.  The dealers were not intended to be the ultimate consumers of the Engines and have no rights under the warranty agreements provided with the Engines.  In addition, the trucks were sold or leased directly to Q+Food and Class members by Defendant pursuant to dealer financing and floor plan financing arrangements, so that title directly passed from Defendant to Q+Food and Class members, thus establishing privity.  Moreover, the federally mandated emissions warranty was and is transferrable to subsequent purchasers within the five year warranty period, meaning that the implied warranty also follows the emissions warranty.  Notwithstanding this, privity is not required in

this case because Plaintiff and the Class members are intended third-party beneficiaries of contracts between MFTA and its dealers; specifically, they are intended beneficiaries of Defendant's implied warranties. The warranty agreements were designed for and intended to benefit the ultimate consumers only.

131.   As a direct and proximate result of Defendant's breach of warranties, Q+Food and the Class were caused to suffer economic damage, including loss attributable to the loss of their warranty investment value, the diminished value of their Engines, loss of use, as well as the monies spent and to be spent to repair and/or replace their Engines.

**COUNT IV**
**BREACH OF IMPLIED COVENANT OF GOOD FAITH**
**AND FAIR DEALING**

132.   Plaintiff incorporates the allegations set forth above as if fully set forth herein.

133.   Plaintiff and the Class entered into agreements to purchase trucks having the BlueTec® SCR Engines with Defendant, or otherwise were in contractual privity with Defendant as a result of the express warranties described herein.

134.   The contracts and warranties were subject to the implied covenant that Defendant would conduct business with Q+Food and the Class in good faith and would deal fairly with them.

135.   Defendant breached those implied covenants by selling Q+Food and the Class defective Engines, when it knew, or should have known, that the contracts and/or warranties were unconscionable and by abusing its discretion in the performance of the contract or by intentionally subjecting Plaintiffs and the Class to a risk (the defective Engines) beyond that which they would have contemplated at the time of purchase, as well as by failing to provide for proper parts and service of the Engines it sold.

136.   As a direct and proximate result of Defendant's breach of the duty of good faith and fair dealing, Plaintiff and the Class have suffered damages.

## COUNT V
## DECLARATORY JUDGMENT

137.   Pursuant to Fed. R. Civ. P. 57 and 28 U.S.C. § 2201(a), Plaintiff and the Class request a Declaratory Judgment as to the contractual obligations set forth in Defendant's warranty.

138.   Defendant's uniform marketing materials, advertisements, press releases and warranties all represented and promised that the BlueTec® SCR Engines would provide "operational stability and reliability."

139.   Defendant has failed to provide a truck to Plaintiff and Class members conforming to this representation and promise.

140.   Defendant's repeated repairs and replacements have shown that Defendant's warranty has failed of its essential purpose, meaning that Plaintiff and

the Class may recover "as damages for [the] nonconformity of tender the loss resulting in the ordinary course of events from Defendant's breach as determined in any reasonable manner." N.J.S.A. 12A:2-717(1).

141.   A reasonable measure for the loss suffered by Plaintiff and the Class is all of the out-of-service costs plus the costs to replace the BlueTec®SCR Engines in all of the trucks with a non-defective, conforming engine.

142.   Therefore, Plaintiff and the Class request a judgment declaring that Defendant's warranty has failed of its essential purpose and that Plaintiff and the Class may recover "as damages for [the] nonconformity of tender the loss resulting in the ordinary course of events from Defendant's breach as determined in any reasonable manner."

## **JURY DEMAND**

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands a trial by jury for all issues so triable.

Dated: September 29, 2014           **SHEPHERD, FINKELMAN, MILLER**
                                    **& SHAH, LLP**

                                    s/ James C. Shah_____
                                    JAMES C. SHAH
                                    NATALIE FINKELMAN BENNETT
                                    475 White Horse Pike
                                    Collingswood, NJ  08107
                                    Tel: 856-858-1770
                                    Fax: 856-858-7012
                                    E-mail:   jshah@sfmslaw.com
                                              nfinkelman@sfmslaw.com

44

Michael D. Donovan
**DONOVAN AXLER LLC**
1845 Walnut Street, Suite 1100
Philadelphia, PA  19103
Tel: (215) 732-6067
Fax: (215) 732-8060
E-mail:  mdonovan@donovanaxler.com

Robert W. Murphy
**ROBERT W. MURPHY**
1212 S.E. 2nd Avenue
Fort Lauderdale, FL  33316
Tel (954) 763-8660
Fax (954) 763-8607
E-Mail:  rwmurphy@lawfirmmurphy.com

*Attorneys for Plaintiff and the Class*