SHEPHERD, FINKELMAN, MILLER
    & SHAH, LLP
JAMES C. SHAH
NATALIE FINKELMAN BENNETT
475 White Horse Pike
Collingswood, NJ  08107
Telephone: 856/858-1770
Facsimile: 866/300-7367
jshah@sfmslaw.com
nfinkelman@sfmslaw.com

Additional Counsel on Signature Page

Attorneys for Plaintiffs

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| Q+FOOD LLC; LAWRENCE BARTON d/b/a LEGEND MEATS, LLC; ENCORE PIANO & ORGAN MOVING, LLC; ALL AMERICAN MOVING AND STORAGE DELIVERY, LLC, and WEST LUMBER & BUILDING SUPPLY CORP; individually and on behalf of all others similarly situated, | No. 14-6046(DEA) |
| | AMENDED CLASS ACTION COMPLAINT |
| | |
| | JURY TRIAL DEMANDED |
| Plaintiffs, | |
| v. | |
| MITSUBISHI FUSO TRUCK OF AMERICA, INC., | |
| Defendant. | |

Plaintiffs, Q+Food LLC ("Q+Food"), Lawrence Barton d/b/a Legend Meats, LLC ("Legend"); Encore Piano & Organ Moving, LLC ("Encore"); All American Moving and Storage and Delivery, LLC ("All American"), and West Lumber & Building Supply Corp. ("West Lumber")  (collectively "Plaintiffs"), by their designated attorneys, individually and on behalf of all others similarly situated, for their Amended Class Action Complaint, allege as follows based upon personal knowledge, the investigation of counsel, information and belief, and publicly available information:

<u>**NATURE OF THE ACTION**</u>

1.      This is a breach of warranty class action arising from Defendant, Mitsubishi Fuso Truck of America, Inc.'s ("Defendant" or "MFTA"), repeated failure and inability to deliver conforming, non-defective trucks, causing the warranty to fail of its essential purpose and constituting a model-wide breach of contract.

2.      Upon information and belief, in October 2009, MFTA issued a press release from its Logan Township, New Jersey, headquarters, announcing that "its EPA 2010-emissions compliant commercial trucks will use engines equipped with BlueTec® technology developed by Mitsubishi Fuso and Daimler AG.  BlueTec® is an emissions control technology that utilizes selective catalytic reduction ("SCR") to reduce nitrogen oxide (NOx) emissions for clean, efficient operation."

http://www.mitfuso.com/en-US/News/2009/11/bluetec-engines-used-in-medium-duty-trucks.

3.      As designed, adapted and installed on the diesel-powered, medium duty trucks sold by Defendant, however, BlueTec® technology has rendered the trucks defective.  Among other things, the technology has resulted in the repeated failure of the Diesel Exhaust Fluid ("DEF") handlers, the fuel injectors, the crank case pressure sensors and breather, the catalytic converter muffler, the DEF tank internal sensor, the engine protection system, the EEC programming, as well as a lack of power, and numerous other problems that have caused the trucks to stall or not restart. Moreover, the trucks have an inherent transmission defect which, among other things, causes the truck's transmission to make noise, jerk, and shift hard or not shift properly at all. In short, all medium duty trucks with the BlueTec® technology sold by Defendant have manifested a model-wide defect causing operational failures about which purchasers throughout the country have continuously complained.

4.      These defects and others have been so extensive as to render the trucks sold by Defendant equipped with the BlueTec® technology inoperable for prolonged periods of time, thus costing their owners thousands of dollars in replacement vehicle costs, lost deliveries and work, and back-up trucking expenses.  For example, as of September 2014, Q+Food's truck was out-of-service

3

for at least 250 of the 790 days in which Q+Food owned the truck at that time.

Other owners have experienced similar out-of-service rates, such as "91 days [out-of-service] in the first year after delivery," together with numerous uncompleted repairs.

5.     Shortly after the Environmental Protection Agency ("EPA") announced heightened emission standards, Defendant rushed to production the FE/FG models, including FE 125 and FE 180 with BlueTec® technology in an effort to sell an "advanced emissions vehicle" to capture market share.  The materials and workmanship of those trucks with the BlueTec® technology, however, were defectively designed, tested, assembled and manufactured, resulting in a uniformly defective truck that essentially shuts down unexpectedly and without apparent reason.

6.     This suit is brought on behalf of Plaintiffs and all other purchasers of Defendant's diesel-powered, medium duty trucks using engines equipped with BlueTec® technology for breach of express and implied warranty under New Jersey, Florida, California, Ohio and Pennsylvania law; breach of the duty of good faith and fair dealing; violations of the New Jersey Consumer Fraud Act, the Florida Deceptive and Unfair Trade Practices Act, and the California Unfair Competition Law; and negligent design/engineering/ manufacturing under Ohio law.

4

7.     As a result of these violations, this action seeks, among other things, damages from loss of warranty investment value, replacement and repair damages, back-up rental and use costs, diminution in value, lost work and other consequential damages, treble damages, interest, and reasonable attorneys' fees and costs.

## PARTIES

8.     Q+Food is a Florida limited liability company wholly owned by Joyelle Yun-Hsuan Fleites and Eduardo Fleites, husband and wife, who are both residents of Florida.  Q+Food is in the business of wholesale seafood sales and delivery and maintains its principal place of business at 820 NE 42nd Street, Ft. Lauderdale, Florida.

9.     Legend is a Texas corporation that is a boutique free range ranch and distributor of all natural gourmet meats. Its principal place of business is located at 770 County Road 195, Gorman, Texas 76454, and it is wholly owned by Lawrence Barton, a resident of Texas.

10.     Encore is a California corporation which operates as a full service piano and organ moving firm with a principal place of business at 15915 Canary Avenue, La Miranda, California 90638.

11.    All American is an Ohio corporation which operates as a moving and storage company with a principal place of business at 3890 Twin Creeks Drive, Columbus, Ohio 43204.

12.    West Lumber is a Pennsylvania corporation operating as a lumber yard and building supply company with a principal place of business located at 7315 Marshall Rd., Upper Darby, Pennsylvania 19082.

13.    Defendant is a Delaware corporation with its principal place of business at 2015 Center Square Road, Logan Township, New Jersey 08085. MFTA is the North American distributor and warrantor of diesel-powered, medium duty cabover trucks through more than 200 dealer locations throughout the United States, Canada, Puerto Rico and Guam.  MFTA is a wholly-owned subsidiary of Mitsubishi Fuso Truck and Bus Corporation, Kawasaki, Japan, which is an integral part of the Daimler Trucks Division of Daimler AG.

## **JURISDICTION AND VENUE**

14.    This Court has subject matter jurisdiction under the Class Action Fairness Act ("CAFA"), codified in various parts in 28 U.S.C. § 1332(d) and § 1446(a).  This class action involves over 100 putative class members; the members of the class are citizens of a state different from the Defendant; and the aggregate amount in controversy exceeds $5 million (exclusive of costs and interest).  On information and belief, during the proposed class period, Defendant sold over

6

5,000 diesel-powered, medium-duty cabover trucks to members of the class, including Plaintiffs.

15.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because Defendant has its principal place of business in Logan Township, NJ, and directs all of its operations, including warranty administration and product press releases, from that location.

## FACTUAL ALLEGATIONS

16.     In order to meet the EPA 2010 Emission Standard ("2010 Standard") applicable to on- highway diesel engines, MFTA designed, manufactured, sold for profit, and warranted the BlueTec® technology Engines (hereinafter, "BlueTec® Engine(s)" or "Engine(s)") with an exhaust emission control system containing integrated components intended to reduce air pollutants, in particular, oxides of nitrogen (NOx) and particulate matter (PM), to levels not to exceed those set by the 2010 Standard.  The exhaust emission control system employed by MFTA consists of three primary elements with supporting components and control software: (i) the Diesel Particulate Filter ("DPF"); (ii) the After-treatment Regeneration Device ("ARD"); and (iii) the Electronic Control Unit ("ECU").  Plaintiffs' claim is that the defect, which was and is known to Defendant, causes a vehicle to not function as required under all operating conditions, on a consistent and reliable basis, even after repeated warranty repairs and replacements. These repeated warranty repairs

7

and replacements fail to repair or correct the defect resulting in damages, including, *inter alia*, loss of warranty investment value, diminished value of the vehicles powered by the Engines, and the costs to re-power the vehicles with diesel engines that are compliant with the 2010 Standard.

17.    The Clean Air Act ("the Act"), 42 USCA ¶¶ 7521-7551, provides the framework for the regulation of emissions from motor vehicles and engines operated in the United States.  Section 7521(a)(1) provides that the EPA shall, by regulation, "prescribe…standards applicable to the emissions of any air pollutant from any class or classes of new motor vehicles or new vehicle engines…whether such vehicles and engines are designed as complete systems or incorporate devices to prevent or control such pollution." Section 7521(a)(3)(A)(i) provides:

> that "regulations under paragraph (1) of this subsection applicable to emissions of hydrocarbons, carbon monoxide, oxides of nitrogen, and particulate matter from classes or categories of heavy duty vehicles or engines manufactured during or after the model year 1983 shall contain standards which reflect the highest degree of emissions reduction achievable through the application of technology which the Administrator determines will be available for the model year to which such standard apply."

18.    Section 7521(m) of the Act provides for regulations regarding the use of emission control diagnostics (referred to as "On Board Diagnostics" or "OBD") capable of "(A) accurately identifying … emission-related systems deterioration or malfunction, including, at a minimum, the catalytic converter and oxygen sensor, which could cause or result in failure of the vehicles to comply with emissions

8

standards…(B) alerting the vehicle's owner or operator to the likely need for

emission-related components or systems maintenance…(C) storing and retrieving

fault codes…and (D) providing access to stored information in the manner

specified by the administrator."[1]

19.     Section 7541(a)(1) of the Act requires that the:

> "[M]anufacturer of each new motor vehicle and new motor engine shall
> warrant to the ultimate purchaser and each subsequent purchaser that such
> vehicle or engine is (A) designed, built, and equipped so as to conform at the
> time of sale with all applicable regulations under section 7521 of this title,
> and (B) free of defects in materials and workmanship which cause such
> vehicle or engine to fail to conform with applicable regulations for its useful
> life (as determined under section 7521(d) of this title)."

20.     In compliance with the mandate of the Act, on January 18, 2001, the

EPA issued its Final Rule-Control of Air Pollution from New Motor Vehicles:

Heavy-Duty Engine and Vehicle Standards and Highway Diesel Fuel Sulfur

Control Requirements ("Final Rule"), effective March 1, 2001.[2]  The Final Rule

states:

> "We are establishing a comprehensive national control program that will
> regulate the heavy-duty vehicle and its fuel as a single system. As a part of
> this program, new emissions standards will begin to take effect in model
> year 2007, and will apply to heavy-duty highway engines and vehicles.
> These standards are based upon the use of high efficiency catalytic exhaust

---

[1] Subsection (m) provides for OBD on light duty vehicles, but the subsection
further states:  "The Administrator may, in the Administrator's discretion,
promulgate regulations requiring manufacturers to install such on board diagnostic
systems on heavy duty vehicles and engines."  40 CFR § 86.007-17.

[2] The 2007 EPA Emission Standard for 2007 and after Heavy-Duty Diesel Engines
is at 40 CFR § 86.007-11.

emissions control devices or comparably effective advanced technologies. Because these devices are damaged by sulfur, we are also reducing the level of sulfur in highway diesel fuel significantly by mid-2006." Federal Register / Vol. 66, No. 12 / Thursday, January 18, 2001 / Rules and Regulations, Final Rule p. 5002.

21.    The 2010 Standard is an on-highway, diesel emission standard so as to "provide engine manufacturers with the lead time needed to effectively phase-in the exhaust emissions control technology that will be used to achieve the emission benefits of the new standard." *Id.* at 5002.

22.    In promulgating the standards, the Agency found:

"We estimate that heavy duty trucks and buses today account for about one-third of nitrogen oxides emissions and one-quarter of particulate matter emissions from mobile sources…This program will reduce particulate matter and oxides of nitrogen emissions from heavy duty engines by 90 percent and 95 percent below current standard levels respectively." *Id.* at 5002.

23.    The EPA standards regulate both diesel vehicle/engine emissions and diesel fuel standards simultaneously, as a single system:

"These options will ensure that there is widespread availability and supply of low sulfur diesel fuel from the very beginning of the program, and will provide engine manufacturers with the lead time needed to efficiently phase-in the exhaust emissions technology that will be used to achieve the emissions benefits of the new standards." Id. at 5002.

24.    The EPA standards set not-to-exceed standards for Oxides of Nitrogen ("NOx"), Non-Methane Hydrocarbons ("NMHC"), Non-Methane Hydrocarbon Equivalent, Carbon Monoxide, and Particulate ("PM").

25.     The Act requires the EPA to set standards which "reflect the greatest degree of emissions reductions achievable through the application of technology… available for the MY to which the standard applies."  *See* Act, Sec. 7521(a)(3). In this regard, the EPA concluded that:

- "[T]he development of diesel emissions control technology has advanced in recent years so that very large emission reductions (in excess of 90%) are possible. Especially through the use of catalytic emission control devices installed in the vehicle exhaust system and integrated with the engine controls. These devices are often referred to 'exhaust emission control' or 'aftertreatment' devices…To meet the new standards, application of high-efficiency exhaust emission controls for both PM and NOx will be needed." *Id*. at 5007.

- "[S]everal exhaust emission control devices have been or are being developed to control harmful diesel exhaust pollutants. Of these we believe the catalyzed diesel particulate filter and the NOx absorber are the most likely candidates to be used to meet the very low diesel exhaust emission standards adopted today." *Id*. at 5036.

- "Like the new PM standard, the new NOx standard is projected to require the addition of a highly efficient NOx emission control system to diesel engines which, with the help from the PM trap will need to be optimized to control NMHC emissions." *Id*. at 5036.

26.     The EPA contemplated that exhaust emission control was necessary for compliance with the emission standards so as to be a "complete emission control system" integrated with on-board diagnostics:[3]

---

[3] Regulatory Impact Analysis EPA42000-010, July 2000, p. 21:  Because these future emission control strategies will rely on electronic controls for adequate performance, EPA expects that the best available on-board diagnostics will be implemented to ensure that these strategies remain effective in-use."

11

•       "The Complete System: We expect that the technologies described above would be integrated into a complete emission control system as described in the final RIA. The engine-out emissions will be balanced with the exhaust emission control package in such a way that the results are the most beneficial from a cost, fuel, economy, emissions standpoint." *Id*. at 5054.

•       "The manufacturers are expected to take a system approach to the problem of optimizing the engine and exhaust control systems to realize the best overall performance possible." *Id*. at 5090.

27.     "Reliability" of the exhaust emission control system is defined by the EPA as "the expectation that emission control technologies must continue to function as required under all operating conditions for the *life of the vehicle*." *Id.* at 5056 (emphasis added).

28.     "After-treatment" refers to the treatment of exhaust, *i.e.*, pollutant reduction after the exhaust leaves the Engine.

29.     "Regeneration" is the "burning off of collected PM (oxidation of the stored PM releasing CO2)." *Id.* at 5047.

## DEFENDANT'S EXHAUST EMISSION ("AFTER-TREATMENT") CONTROL SYSTEM

30.     After the EPA's announcement of the 2010 Standard, Defendant made the business decision to investigate, design, manufacture, warrant and sell, for profit, diesel engines and trucks using BlueTec® Engines that it said complied with all of the requirements of the 2010 Standard.

31.     In its October 21, 2009 Press Release announcing the new Engines, Leighton Good, MFTA's manager of product and applications, said:  "BlueTec®

12

SCR represents an excellent solution for [MFTA's] customers to meet EPA 2010 emissions regulations. . . .  It is a proven, easy-to-use technology designed to increase fuel economy while protecting the environment."  In addition, Mr. Good explained in the press release that "BlueTec® SCR has been in commercial operation in Europe since 2005, with 250,000 vehicles sold so far, most running in Europe."  He is directly quoted in the press release, stating:  "'We know exactly how the technology functions over time, and we're confident it will provide our trucks with unparalleled operational stability and reliability.'"

32.    MFTA marketed the BlueTec® Engines as a better alternative to the systems installed by other truck engine manufacturers to comply with the new EPA regulations.

33.    MFTA's representations about the BlueTec® Engines proved to be wrong, as the defect put extreme and harmful pressure on the Engine, resulting in regular and catastrophic failures of the Engines.

34.    Defendant also touted that the expected life of the after-treatment unit was equal to the life of the Engine itself and better than competing technologies: "With BlueTec® technology, exhaust gas recirculation can actually be reduced, improving engine efficiency.  In addition, the regeneration interval of the diesel particulate filter is extended, requiring less fuel to burn off soot collected by the filter.  The combination of these innovations is improved fuel economy, compared

to EPA 2007-compliant engines with comparable ratings, under the same operating conditions and loads.  A DEF gauge will be integrated into the instrument panel, to allow the driver to readily monitor DEF tank level.  In addition, on-board diagnostics will monitor the function of the emissions system to maintain EPA 2010 compliance and immediately communicate system status to the driver."

35.    As trumpeted by Defendant's press release:  BlueTec® emissions technology "provides full emissions compliance by treating the downstream exhaust gas.  The system consists of components already introduced to meet EPA's 2007 emissions regulations (the diesel particulate filter, or DPF, the diesel oxidation catalyst, or DDC), plus SCR catalyst and diesel exhaust fluid (DEF) tank, doser and control module.  During operation, the DEF doser atomizes and sprays small, carefully regulated amounts of diesel exhaust fluid into the exhaust stream.  Once in the SCR catalyst, the NOx in the exhaust gas reacts with the DEF to form water and nitrogen – both harmless components of the air we breathe."

36.    However, contrary to the express expectation of the EPA regulations, MFTA's BlueTec® Engines insufficiently catalyzed emissions, periodically requiring active regeneration to increase exhaust temperatures needed to burn off the filter.

37.    As noted in the press release, the operation of the BlueTec® SCR, as necessary to meet the Clean Air Act OBD requirements, uses monitoring and

14

diagnostic sensors and the ECU software to regulate and monitor the operation of the DPF and DOC to ensure that the engine exhaust has sufficiently reduced pollutants to the level mandated by the 2010 Standard.

38.     The ECU is a comprehensive, programmable engine monitoring system. It continuously monitors engine operating conditions, controls particulate emissions, interfaces with the vehicles' sensor inputs, and performs the fault detection and diagnostic reporting requirements for OBD. The ECU monitors all of the systems of the Engine, including the exhaust emissions controls - "Operating conditions of the After-treatment Regeneration Device (ARD)" and the "Operating conditions of The Diesel Particulate Filter." In response to operating conditions, the ECU is programmed to provide one of the following levels of response to operating conditions: (1) Warning; (2) De-rate; or (3) Shutdown.

•      "Warning" advises the driver that action must be taken or the ECM will proceed to shut down.

•      "De-rate" means that the ECM de-rates the engine's performance (reduces horsepower) in order to get the driver's attention so the driver can take action in order to avoid engine damage.

•      "Shutdown" means that the ECM takes action necessary to shut down the engine within a short period to allow the driver to get off the road.

In all instances, the event is logged and the vehicle requires immediate authorized maintenance.

39.     The ECU's software determines if the BlueTec® SCR is operating correctly, detects faults in BlueTec® SCR operation, activates diagnostic trouble

15

codes, and controls engine operation, including activating warning, de-rating, and shutdown functions. In much the same way as an engine automatically adapts to airflow needs, the ECU interfaces with the vehicle to receive sensor input, compare the input to programmed operational parameters, and provide output which is converted into mechanical responses. In particular, the ECU monitors the BlueTec® SCR after-treatment and pressure sensors to determine when regeneration of the DPF is required, whether regeneration occurs, and whether warning, de-rating, and/or engine shutdown is necessary due to BlueTec® SCR failure. If working correctly, the result is an efficient integration of exhaust emission control under all operating conditions. The basis of Plaintiffs' claims is that the BlueTec® SCR, and, in turn, the entire emissions and regeneration system, does not and cannot function efficiently and reliably.

40.     In addition to monitoring the efficient operation of the Engine's various systems, the ECU logs and stores "Active Codes," "Logged Diagnostic Codes," and "Logged Event Codes" by the number of occurrences within a specified Engine operating time (the cumulative time of engine operating hours), as well as other Engine and SCR data.

41.     The ECU has the ability to detect problems and initiate warning, de-rate, and shutdown responses when the specific fault detected is of such severity as to require action. Some codes indicate problems with the monitoring sensors

16

themselves, and may not require any action; some may be intermittent, while others indicate undesirable operating conditions, like failure of the BlueTec® SCR to regenerate.  When operating codes occur, the codes are "active," meaning that the condition giving rise to the code is currently existing and in need of further diagnosis and likely remediation.

42.     Upon information and belief, the ECU fault detection function is quantified by a corresponding numeric "code." Some codes relate to the fault detection of the BlueTec® SCR, and others relate to other systems in the Engine. When a fault in the operation of any part of the BlueTec® SCR threatens the integrity of the Engine, the Engine shuts down entirely.

43.     The ECU is responsible for both fault detection and fault reporting. As a result, when a truck is shut down, de-rated, or a warning lamp illuminated, as indicated previously, the ECU records and stores this information. When the vehicle is brought in to an MFTA-authorized dealer for emissions warranty repair for a BlueTec® SCR failure, it can be identified by accessing the ECU stored data.

44.     Because of the significant hazard resulting from a BlueTec® SCR regeneration failure, the Engine contains a program which determines the Engine's response to this failure. The ECU activates the OBD to issue a warning to the operator, or automatically de-rate, or shut down, the Engine.

45.     In the event of de-rate or a shutdown, the truck is no longer able to operate safely on the highway until authorized maintenance is performed.

46.     In the event of a BlueTec® SCR OBD warning, de-rate, or shutdown, the truck can no longer operate and must be taken in for repair at an authorized MFTA facility. This means that for a truck in operation, the truck that shut down must be towed in for repair, and the truck is then unusable for that period of time.

47.     The BlueTec® SCR repeatedly and frequently experiences warning, de-rate, and shutdown commands issued by the ECU as a result of fault detection, which cause the trucks to require immediate authorized exhaust emission control diagnoses and remediation, during which time the trucks are out of service.

48.     Further, the trucks have a transmission defect which, among other things, causes the truck's transmission to make noise, jerk, and shift hard or not shift properly at all.

## PLAINTIFFS' AND THE CLASS' EXPERIENCE

49.     Upon information and belief, the design, modification, installation and decisions regarding the Engines within Plaintiffs' and class members' vehicles were performed exclusively by MFTA. Further, MFTA created the BlueTec® SCR so that it could not be disabled or bypassed in any way by anyone other than an MFTA-authorized technician.

18

50.     Defendant developed the owner's manuals, warranty booklets and information included in maintenance and repair recommendations and/or schedules for the Engines and the vehicles at its headquarters in New Jersey.

51.     MFTA provides "The Canter Advantage: Warranty – The Best Medium Duty Truck Warranty."  In summary, it provides:  "Mitsubishi Fuso protects your new truck investment long after competitors' warranties have expired.  We combine 3-year bumper-to-bumper, 4-year rust-through, and 5-year/175,000-mile powertrain limited warranties into the strongest warranty package available on any class 3-5 trucks.  Our 5-year standard powertrain protection leads the industry and is a testament to the longevity you can expect from your new Mitsubishi Fuso vehicle."  Under the three year warranty, MFTA promises:  "For the first 36 months, regardless of mileage, any originally installed components of the truck (excluding batteries, tires, and custom-made rear bodies and accessories), under normal use and maintenance, will be repaired or replaced by an Authorized Dealer, using genuine Mitsubishi Fuso parts, at no charge for parts and labor."

52.     The five-year powertrain warranty covers engine and transmission components such as the "Cylinder Head Assembly and Valve Cover, Oil Pump and Oil Pan, Exhaust Manifold and Intake Manifold . . . Fuel Supply Pump, Common Rail, Injectors and Related Lines, Turbocharger, Water Pump, Starter and

19

Alternator" . . . and transmission components.  Upon expiration of the 36-month/unlimited-mileage warranty, the powertrain warranty "will continue to cover the powertrain components . . . for 60 months or 175,000 miles."

53.    MFTA further provides a "5-Year Emission Control System" warranty that covers the "BlueTec® Emission Control System" and components for the first 60 months, and promises that "any genuine Mitsubishi Fuso parts covered by the MFTA emissions warranty that prove defective in material or workmanship will be repaired or replaced by any Authorized Dealer, using genuine Mitsubishi Fuso replacement parts, at no charge for parts and labor."

54.    Under this warranty, MFTA warranted to all owners and users of its BlueTec® SCR Engines that all emissions related parts and components were designed, built, and equipped so as to conform to the 2010 Standard.  This warranty was required by the federal EPA Emission Standards and, therefore, was uniform and, in turn, subject to uniform standards, principles and applications, based on minimum standards, for both direct and transfer purchasers within the warranty period, throughout the United States.

55.    MFTA expressly warranted to Plaintiffs and class members that the exhaust emission controls of its BlueTec® SCR Engines were free from defects in material and workmanship and, in the event a defect manifested, MFTA was obligated to correct the defect.

56.     Contrary to this warranted representation, the Engine was and is defective, *inter alia*, in that the exhaust emission controls repeatedly and frequently fail to function properly in reducing emission pollutants on a reliable and dependable basis, resulting in repeated fault detection, and failures, causing vehicle shutdown.  The faults here resulted in warning, derating, and shutdown, requiring authorized and expensive maintenance to remediate the active fault codes before the trucks can be used, which defects MFTA has been unable to correct in spite of repeated and numerous attempts.

57.     Moreover, contrary to its warranted representation, the transmission was and is defective, inter alia, in that the defect causes the truck's transmission to make noise, jerk, and shift hard or not shift properly at all.  MFTA has been unable to correct these defects despite repeated and numerous attempts.  The symptoms of the transmission defect require immediate diagnoses and remediation, during which time the trucks are out of service.

58.     Defendant knew, or should have known, that the Engine's BlueTec® SCR and transmission were defective, and that the defects could not be corrected.

59.     In performing emission system and standard warranty repairs, MFTA acknowledges that the BlueTec® SCR failures detected are defects in material and workmanship in the Engines because the emissions warranty repairs are performed.

21

60.     However, the Engines repeatedly experience failures that are not corrected by the emission warranty work or standard warranty work performed. These repeated and frequent failures cause the vehicles to be unreliable and which, in spite of numerous attempts, the BlueTec® SCR failures have not and cannot be corrected. The numerous and frequent faults cause warning, de-rate, and shutdown, necessitate costly and time-consuming emissions and standard warranty repairs that render them unreliable and unsafe for transportation because the Engines do not and cannot effectively and reliably remove exhaust emission pollutants as required by the 2010 Standard on a consistent and reliable basis.

61.     By failing to correct the defects, and in spite of repeated, frequent attempts, Defendant has breached its express written Emissions Warranty, and its express written standard and powertrain warranties. By its conduct, Defendant has also violated its statutory obligations.

62.     Not long after Plaintiffs and Class members purchased or leased trucks with the Engines, and within the warranty period of their warranty and/or Emission Warranty, they began to experience numerous failures of the BlueTec® SCR and transmissions to operate effectively and reliably. This caused Plaintiffs and class members to incur significant damages, including the lost investment value of the warranty and diminution of the value of their trucks.

63.     Plaintiffs' Engines detected numerous and various faults in the operation of the BlueTec® SCR, which triggered warning, de-rating, and shut down necessitating delivery of the vehicles to an authorized MFTA repair facility for emissions warranty work.

64.     In spite of repeated emissions warranty work on the BlueTec® SCR, Plaintiffs and members of the class experienced repeated instances of warning lights illuminating, Engine de-rating and shutdown, after-treatment regeneration devices plugging and/or clogging, and DPF regeneration failure, as well as a myriad of system failures that prevented the Engines from properly regenerating.

65.     Despite Defendant's numerous attempts to correct BlueTec® SCR failures, the Engine exhaust emission controls do not function as required under all operating conditions, and will not do so for the expected life of the vehicle.

66.     Defendant represented to Plaintiffs and class members that each warranty repair would correct the defect; but after repair, Plaintiffs and class members continue to experience defective exhaust emission control, when MFTA knew, or should have known, that the defects could not be corrected.

67.     Although many Engines are still in service and Defendant had promised to back them with the proper service, this has not happened.

68.     In addition, authorized service centers are unable to obtain the necessary parts from Defendant, despite its warranty obligations, such that some authorized service centers are unable to service the Engines.

69.     Moreover, despite repeated attempts by MFTA to cure the transmission defect, Plaintiffs and members of the class experienced repeated transmission failures.  As a result, the Engine and transmission do not function as required under all operating conditions, and will not do so for the expected life of the vehicle.

70.     Defendant represented to Plaintiffs and class members that each warranty repair would correct the transmission defect; but after repair, Plaintiffs and class members continue to experience defective transmission, when MFTA knew, or should have known, that the defects could not be corrected.

71.     As a result of the above repairs and recalls and hundreds of days out-of-service, MFTA's warranty has failed of its essential purpose, as MFTA has not delivered a conforming truck free from defects in material and workmanship, even after performing repairs and replacements.  The repairs and replacements also have been defective, meaning that MFTA has never complied with its warranty promise, and the warranty has failed of its essential purpose, *i.e.*, to restore the truck to a non-defective, conforming condition.

24

72.     Plaintiffs and class members continue to experience Engine failures and repeated and ineffective repairs when Defendant knew, or should have known, that the defects and related Engine failures could not be corrected.

73.     Plaintiffs and class members have suffered substantial financial losses and other damages as a result of Defendant's actions and the defective Engines.

**Plaintiff Q+Food**

74.     Q+Food purchased a new 2012 FE 125, VIN No. JL6AME1A5CK000587, on July 22, 2011 from MFTA's authorized dealer, Tri-County Truck & Equipment ("Tri-County") in Pompano Beach, Florida.

75.     Within the first month, on August 22, 2011, the truck shut down and failed to regenerate, requiring service by Tri-County to make the truck operable. The truck was not available until August 24, 2011.

76.     On September 6, 2011, the same defect manifested, again requiring service to make the truck operable. The truck was not available until September 13, 2011.

77.     On October 4, 2011, at a mileage of 7,070, the same emissions system defect occurred again, also requiring service to make the truck operable. The truck was not available until October 11, 2011.

78.     On June 13, 2012, the check engine light went on indicating that the SCR was "out-of-perimeter," again requiring service by Tri-County.

79.     On July 12, 2012, the check engine light again stayed on due to "inoperable crankcase pressure sensors."  Service was again required, where Tri-County had to "manually regenerate [] DPF system 3 times."  The truck was unavailable until July 23, 2012.

80.     On August 13, 2012, the check engine light again stayed on due to an "internal defect with the catalytic converter muffler."  The truck was unavailable until August 14, 2012.

81.     On April 11, 2013, the check engine light again stayed on, requiring replacement of the "mass air flow sensor and injector line."  The truck was unavailable until April 29, 2013.

82.     On July 18, 2013, the DEF light came on, requiring a "close internal" and manual regeneration.  The truck was unavailable until August 6, 2013.

83.     On November 26, 2013, the check engine light came on and the truck shut down, requiring a tow to the dealer for service.  The technicians "found DEF internal sensor failure . . . DEF injector crystalized clogged . . . temp gauge failed . . . harness shorted."  The truck was unavailable until November 30, 2013.

84.     On April 2, 2014, Q+Food had routine and scheduled maintenance and service performed on the truck by MFTA's authorized dealer.

85.     On June 11, 2014, the check engine light went on, requiring manual regeneration, with the technician noting that the "unit may need turbo."  The truck was unavailable until June 12, 2014.

86.     On June 14, 2014, the check engine light went on, but MFTA's authorized dealer could not diagnose the problem, so Q+Food retrieved its vehicle on June 17, 2014.

87.     On June 21, 2014, the truck would not shift and was locked down. The authorized dealer found that "unit needs a NOx sensor" and manual regeneration.  The truck was not available until July 8, 2014.

88.     In addition to the foregoing repairs and out-of-service periods, the truck was also out-of-service for three recalls required by MFTA: the first on November 28, 2012 – for "engine EEC reprogramming," "Duonic TCM reprogramming," "fuel pressure low return hose," and other matters – taking the truck out-of-service until December 18, 2012; the second on May 29, 2013 – for "EEC reprogramming" – taking the truck out-of-service until June 18, 2013; and the third on April 17, 2014 for "Duonic ATF contamination recall," taking the truck out-of-service until May 31, 2014.

89.     On July 30, 2014, in response to Q+Food's repeated notices and complaints, Joseph P. Watkins, Product Support Manager of MFTA in Logan Township, NJ, sent Q+Food an email in which he stated, among other things, that

"we [MFTA] have come to the determination that no further assistance will be provided at this time."

90.     As a result of this email and the numerous repairs and recalls and the hundreds of days out-of-service, MFTA's warranty has failed of its essential purpose, as MFTA has not delivered a conforming truck free from defects in material and workmanship, even after performing repairs and replacements.  The repairs and replacements also have been defective, meaning that MFTA has never complied with its warranty promise, and the warranty has failed of its essential purpose, *i.e.* to restore the truck to a non-defective, conforming condition.

## Legend

91.     Lawrence Barton, d/b/a Legend Meats, LLC, purchased a new 2012 Mitsubishi Fuso FE180, VIN No. JL6CRH1A1CK0122893, on or about July 24, 2012 from MFTA's authorized dealer, North Jersey Truck Center in Elmwood Park, New Jersey.

92.     On May 1, 2015, the truck shut down resulting in turbo failure, and the truck failed to regenerate, requiring service by Dallas Trailer Repair Co., Inc. to make the truck operable. The turbo was removed and the repair service noted that "it had failed and found excessive oil in the intake."  The turbo and DPF were replaced "due to the turbo failing and filling it with oil."  A regenerate was run without completion and the truck was test-driven.  A second regenerate was run

and still would not complete. The truck's injectors were replaced and a third regenerate was finally run to completion. The repair service "ran two more regns to clean the DPF and catalyticconverter."  The truck was not available for over a month.

93.     On June 10, 2015, the same defect manifested, resulting in, *inter alia*, an engine fire, requiring service to make the truck operable. The engine and transmission were removed and the engine wiring harness was replaced, along with fuel and brake lines. Multiple "codes for low power" and "six blown fuses" were revealed, and the fuses were replaced. A manual regenerate was run; however, when attempting to place the truck in gear, "the shifter would not move." After several replacements, the transmission was programmed and the repair service "performed a relearn on the transmission and performed a manual bleeding on the abs" and the vehicle was test driven. The truck was not available for another eight weeks.

**Encore**

94.     On or about April 6, 2012, Encore purchased a new 2012 Mitsubishi Fuso FE180, VIN No. JL6CRK1A7CK014614, from MFTA's authorized dealer, Carmenita Truck Center ("Carmenita") in Santa Fe Springs, California.

95.     Within several months, on December 21, 2012, the truck's check engine light came on and the truck required service by the dealer's repair service.

29

96.     Carmenita "perform[ed a] crankcase pressure reading," the crankcase breather filter was removed, and the filter was also replaced.  The repair service also performed a recall reprogramming of the "EEC module with the latest calibration" and a "reprogramming of TCM module with the latest calibration" were performed, in addition to maintenance to fluid level, fuel injector, and the fuel filter head.  The truck was not available until December 28, 2012.

97.     On March 25, 2013, the truck's check engine light came on again and indicated a "faulty air flow sensor" malfunction.  Encore brought the truck back to Carmenita, which replaced the air flow sensor and "perform[ed] relearning while perform[ing] air flow relearn. . . ."  The truck was not available until March 29, 2013.

98.     On June 20, 2013, while driving on the highway, Encore's truck engine began to overheat and the dashboard lights came on.  The truck was brought back to Carmenita.  The repair center removed the fan clutch, performed a recall EEC module reprogramming, and a manual regeneration.  The truck was not available until July 1, 2013.

99.     On August 13, 2013, the truck again malfunctioned and was brought by Encore to another repair center, Diesel Performance, Inc. in Stockton, California.  The repair service noted that time codes were found "for high

crankcase pressure," the breather cover was removed, the front cover alignment was checked, and the codes were cleared.

100.   On November 18, 2013, Encore again had to bring the truck to Carmenita for service because the "check and repair engine system & EML [was] on, dash reading erratically & RPM randomly."  The repair center performed multiple services, test-drove the truck, removed and replaced the turbo, and performed yet another regeneration. The truck was not available until December 17, 2013.

101.   On March 17, 2014, the check engine light was on at the dash again and the service repair center found "different pressure in the crankcase (Hi) . . . found MIL light on at the dash."  The breather filter was removed and replaced, and the truck was road tested. Other maintenance services were performed, including engine oil and filter replacement; removal of old transmission fluid; cooling system exchange service; and diesel fuel injection service to clean injectors and fuel system.  The truck's water pump was found leaking as well, which was replaced with a new gasket. The truck was not available until March 24, 2014.

102.   On March 31, 2014, the truck's engine was overheating and the repair service found that the "coolant level was low." The repair shop recommended that Plaintiff should "check the fluid levels every day; may be sabotaged by somebody."   The truck was not available until the next day.

31

103.   On April 7, 2014, the truck's engine was overheating after driving 50 miles, at which time the operator of the truck was required to add one gallon of coolant.  The coolant system was found to be low, but a coolant pressure test found no leaks.  The repair shop "remove[d] and replace[d] EGR cooler and retest found no leak."  Recall services were also performed in reprogramming the EEC module for the engine protection system and maintenance on the transmission. The truck was not available until April 11, 2014.

104.   On July 14, 2014, the truck's check engine light was on again at the dash.  The repair center "found code 520380 31 NOx sensor power supply is faulty."  A regeneration was performed, revealing an exhaust leak noise from the exhaust manifold.  The turbo and the heat shield were removed and all manifold studs were replaced.  New gaskets and a new pipe were installed, a second regeneration was performed, and the check engine light illuminated again. The repair shop noted "replace NOx sensor perform regen, regen pass test drive."

105.   On July 30, 2014, the truck's check engine light was illuminated again.  United Truck Centers in Sylmar, California ("United") serviced the vehicle, found the cause of the light to be "defective NOx sensor."  The engine's oil and coolant were also checked.  After some repairs and a road test, the check engine light illuminated again.  The battery cables were checked and tightened as needed, along with the EEC connectors. Diagnostic testing was performed for the check

32

engine light code. After a second test, the engine was deemed operational and no lights were illuminated at this time.

106.   On November 18, 2014, the "regen light" and "DPR light" were on at the truck's dash and the engine would not regenerate. The breather filter was replaced and retested and all codes were then cleared.  Recall services were also performed at this time, including work to the fuel filter and oil cooler hose.  The truck was not available until November 20, 2014.

107.   On December 29, 2014, the check engine light was on again at the dash.  Encore again brought the truck to the repair center, which performed a regeneration to clear the code.  The service repair shop "found exhaust manifold is crack and leaking from the crack, remove turbo oil supply and return, remove turbo down pipe intake pipe heat shield and remove turbo assembly to get access to remove exhaust manifold." The manifold was removed and new one was installed with new gaskets.  Another regeneration was performed and the truck was returned to Encore on January 9, 2015.

108.   On April 9, 2015, the check engine light and the engine system light were on.  There was also a "whistle noise at high RPM" and lacks power on and off."  The repair shop verified this complaint and serviced the truck.  A regeneration was performed and the truck failed to regenerate, as there was an exhaust leak at the turbo gasket.  The check engine light came on again at this

33

time.  The turbo gasket and EGR cooler gaskets were removed and replaced. A

third regeneration finally passed and cleared the codes.  The truck was not

available until April 13, 2015.

109.   On April 20, 2015, the truck's engine was dumping oil, overheating

and smoking.  The check engine light was on as well and the repair shop found that

the truck was leaking oil and the serpentine belt was making noise.  Codes were

verified and were noted to relate to "low boost pressure, DPF system abnormal,

crankcase pressure." Oil was found inside the exhaust system and DPF filter and

SCR muffler, as well as in the side turbo and air charge box.  The turbo was

removed, along with the exhaust manifold.  An engine compression test was also

performed at this time.  An exhaust manifold was installed with new gasket, along

with a new turbo unit.  Other maintenance and repairs were made before the engine

was running normally again and the codes were cleared.  The repair shop noted

that it "perform[ed] reset SCR muffler and DEF replacement reset." A regeneration

was performed to verify the repair and the truck was released to Encore on May 4,

2015.

**All American**

110.   On or about May 23, 2012, All American purchased two new 2013

Mitsubishi Fuso FE180s, VIN Nos. JL6CRK1A9DK000117 ("Truck No. 1") and

JL6CRK1A1DK000564 ("Truck No. 2") from MFTA's authorized dealer, DeMary Truck ("DeMary") in Columbus, Ohio.

### *Truck No. 1*

111.   On April 17, 2013, Truck No. 1 required service by DeMary, which "perfom[ed] V68.1 EEC reprograming" and replaced the NOx sensor. The truck was not available until the following day.

112.   Within several months, on July 16, 2013, the truck's transmission was not shifting properly and was stuck in one gear until the driver shut off the engine and restarted the vehicle.  The truck was brought back to DeMary and the subsequent repair service invoice noted that there was a "transmission internal failure," requiring removal and replacement of the transmission.  The truck was not available until July 19, 2013.

113.   On January 3, 2014, the truck's Signal Actuation Module ("SAM") and engine system warning light illuminated.  The truck was brought back to DeMary where the diagnosis was that the "engine coolant temp [was] reading inaccurately."  The doser was removed and cleaned, along with mass air flow, intake air temperature and boost sensors. The positive crankcase ventilator valve and crankcase sensors were also cleaned and the truck's diesel particulate filter sensor was replaced.  The truck was not available until January 13, 2014.

114.   Less than two weeks after getting the truck back from a recent service visit for transmission issues, on March 20, 2014, the truck's check engine light once again illuminated.  The repair service shop performed a "forced regen" and cleared the codes. The truck was not available until the following day.

115.   On July 14, 2014, the truck's check engine light illuminated yet again, and the truck's intake and exhaust sensors subsequently failed during inspection. The IAT sensor was replaced, oil was found leaking from the PCV seal, regeneration was performed revealing a high NOx, and the SCR assembly was removed and replaced.  The truck was not available until the following day.

116.   On July 16, 2014, the truck's turbo failed and, upon inspection, DeMary found that the "front cover [was] leaking [and the] DPF [was] contaminated."  The repair shop also found that the "intercooler pipes [were] full of oil" and replaced the turbo, DPF and related sensors, gaskets and hardware.  After a regeneration, the truck was returned on July 23, 2014.

117.   On August 29, 2014, the engine system lights and buzzer were activated and the truck was in limp mode.  The repair notice noted "PSM advised to replace def tank with updated part."  The truck was road tested and returned on August 29, 2014.  In addition, the engine system's red warning light illuminated on the truck, and DeMary found that the "doser [was] clogged" and the red light

illuminated again after a test drive.  The doser was cleaned and tested, the vehicle was road tested and returned on the same day.

118.    On June 1, 2015, the truck would not start and the engine system warning light once again illuminated.  DeMary found multiple codes and removed the common rail and injection pump.  The repair service also found that the "truck is still hard to start due to existing condition of fuel filters. Truck currently has eng/sys warning light on due to failed exhaust."  The fuel filters were removed and replaced, along with the exhaust brake.  Still, the truck was not starting properly, and further inspection found the fuel pick up tube was cracked.  DeMary replaced the damaged tube and finally the truck started again.  The truck was not available until June 16, 2015.

### *Truck No. 2*

119.    On April 12, 2013, Truck No. 2 required service because the "engine front cover [was] leaking [oil], [and the] front crank seal [was] leaking." The truck's radiator and shroud were removed, and the cover was loosened, aligned, and the truck's gasket was replaced. The truck was not available until April 16, 2013.

120.    On September 13, 2013, the truck's transmission was making noise and jerked while in reverse and there was an oil leak in in the left front engine.

DeMary performed a software update to the engine EEC. The truck was not available until September 16, 2013.

121.   On December 2, 2013, the truck's check engine light was illuminated and its engine system warning was turning on intermittently.  DeMary removed and replaced the doser and "clean[ed] MAP, IAT and boost sensors, checked crankcase, contacted psm, advised to replace SCR and temp sensors."  The repair shop replaced the SCR and temp sensors.  After a regeneration, the check engine light came back on and it was determined that the exhaust brake valve was sticking.  DeMary replaced the exhaust brake, cleared codes and performed a regeneration. Other maintenance services were performed, and the truck was finally returned for pick up on December 10, 2013.

122.   On March 25, 2014, the engine system warning lights were again illuminated, and the truck was unable to exceed 40 miles per hour.  Additionally, the SAM light was the only light on the dash.  The codes could not be cleared and multiple other maintenance services were performed. The truck was not available until April 1, 2014.

123.   On May 13, 2014, the truck's engine system warning light again illuminated and the truck would not exceed 45 miles per hour.  The repair invoice indicated that the "engine temp does not stay constant, like thermostat is sticking open. Drained coolant and inspect stat, seal broken. Replace stat and refill

coollance." The doser was cleaned and the vehicle was regenerated, at which time the truck started smoking. The repair invoice indicated that the turbo needed replacement, and was replaced. The codes were then cleared and the truck was finally released on May 23, 2014.

124. On June 2, 2014, the truck was in need of service due to the engine systems light illuminating and the vehicle having no power. Degel Truck Center in St. Louis, Missouri, serviced the vehicle, noting "lift pump was not working. R&R pump, engine was no start. Shows no replace injection pump, replaced pump. Engine still no start." After replacing the return line from the injectors, the engine still did not start. The head was reinstalled with new injectors, and the common rail was replaced. Other maintenance was performed on the fuel tank. The truck was not available until June 18, 2014.

125. On September 22, 2014, the truck's DEF warning light illuminated, and the transmission was not working correctly. A software upgrade was completed and codes were cleared before returning the vehicle on September 24, 2014.

126. On January 20, 2015, the truck's engine system warning light illuminated and the vehicle lost all power. The repair invoice noted the truck "is now a crank no start." The truck's wiring was repaired and its boost sensor and IAT were removed for inspection and cleaned. Among other maintenance repairs,

the exhaust was also found to be leaking, the truck's harness was repaired along with the exhaust gasket and EGR pipe, a turbo and mixing pipe were installed, and the vehicle was regenerated.  In addition, the truck's transmission system warning light illuminated and broken wiring for the ABS wheel speed sensor was repaired. Due to the starter and belt tensioner and idler making noise, multiple replacements were made. The truck was finally returned on January 27, 2015.

127.   On June 16, 2015, the truck was unable to operate and its engine system warning light, check engine, and DEF warning lights were illuminated. Among other repairs, the truck's filter was replaced, along with the PVC element. After a regeneration, the truck was finally returned on June 25, 2015.

128.   On August 27, 2015, the truck's DPF light was flashing and the driver was unable to regenerate the vehicle.  The regeneration light was found to be flashing and the engine system plus amber check engine light illuminated. Additionally, the transmission would not drive into first gear when the vehicle was first started.  The transmission was reinstalled, and after a test drive the transmission was found "jerking from dead shop and shifting hard."  DeMary removed and replaced the transmission again.  The truck was finally returned on September 3, 2015.

**West Lumber**

40

129.   On or around November 18, 2015, West Lumber purchased a used 2012 Mitsubishi Fuso FE180, VIN No. JL6CRH1A2CK000011, from a MFTA-authorized dealer, AM Mitsubishi Fuso Inc. Truck Center ("AM Mitsubishi") in Philadelphia, Pennsylvania.

130.   The vehicle came with the remaining factory powertrain warranty.

131.   On or around December 14, 2015 – less than a month after purchase – the vehicle required service by AM Mitsubishi because the check engine light illuminated and the transmission was making noise and "shifting hard." Technicians replaced the transmission as well as four hose clamps, the injector rail, and the injector pump. Oil was added, some additional work – such as a "cold weather update" – was performed, and the codes were cleared. The truck was unavailable until December 19, 2015.

132.   About two weeks later, on or about January 5, 2016, the check engine light illuminated and the truck lost all power during operation. It had to be towed to AM Mitsubishi, where technicians replaced the DEF tank, reprogrammed the EEC, changed the oil, replaced the oil filter, and cleared the codes. The truck was not available until January 11, 2016.

133.   On January 11 – the same day West Lumber picked the truck up from AM Mitsubishi – the check engine light illuminated and the truck began

experiencing transmission issues. Namely, the truck was shifting into first gear at inappropriate times. Employees of AM Mitsubishi retrieved the truck for repair.

134.   Plaintiffs and class members continue to experience Engine and transmission failures and repeated and ineffective repairs when Defendant knew, or should have known, that the defects and related Engine failures could not be corrected.

135.   Plaintiffs and class members have suffered substantial financial losses and other damages as a result of Defendant's actions and the defective Engines and transmissions.

136.   Consistent with Plaintiffs' experiences, dozens of consumers have also provided notice to MFTA of the defects described above, both through direct communications and individual lawsuits, and through Internet complaint forums. Set forth below is a sample of some of the Internet complaints:

**Other Consumer Complaints**

A. Ken M [ July 05, 2012 @ 10:45AM ]

We purchased 3 2012 Cannter 160's in Dec 2011. The truck when empty works fine, however, when a load or trailer with load is added the transmission does't know what to do. They all shift from 2-6 in 200' of take off. They won't down shift going up hills. They actually have shut down in the middle of the highway. Japan said they were aware of problems, sent a representative to evaluate. They were going to product an entirely new control module. We haven't heard from them yet The trucks seem to run fine if operated as a standard trans. if your drivers are capable of that, however,

we purchased a truck that was supposed to have an automatic trans, and it does't

B. michael [ December 07, 2012 @ 12:35AM ]

brought one of these trucks RUBBISH !!!!!!!!!!! COULD NOT PULL THE SKIN OFF A RICE PUDDING

C. darin [ January 29, 2013 @ 09:30PM ]

emission problems regularly.truck is going to run me out of business from rental costs while in for repairs.

D. adam m [ May 02, 2013 @ 02:56PM ]

Regarding my 2012 Mitsubishi Fuso Canter....
Disaster! Nothing but trouble since day one. Regularly went into limp mode. The transmission was reluctant to downshift when desired, then downshifted when not desired, at uncomfortable-sounding revs. Very hesistant when starting from a full stop. Very slow to shift in manual mode as well. The check engine light was often on. The dealer(Robert Green, Monticello, NY) was very responsive and professional but nobody could fix the thing. I inquired several times about trading it in for another brand. Then, blessedly, the truck went several months without going into limp mode. But Monday(today's Thursday) as I was driving home from a job, with 19000 miles on the truck, the transmission died, and I coasted to a stop.
The dealer replaced the transmission in two days! But driving back from the dealer yesterday the check engine light was on again, and the transmission was reluctant to downshift in drive, and appeared to be slipping, here and there. I resolved then to get rid of this truck at any cost and started making inquiries about other makes. Today I took the truck out for 20 minutes or so and not only was the check engine light on but the buzzer--the high-pitched sound that, for example, is heard when a door is not fully closed--was on all the time!
The dealer sent a tow truck today with a promise to work on it right away.

E. Kevin LPL [ May 09, 2013 @ 03:30PM ]

Looks like now i'm not to buying a new Fuso FE.. or atleast an automatic.

Does the standard have the same issues?

F. Mike T [ May 13, 2013 @ 04:41PM ]

Problems since day one. We have experienced all of the complaints and problems of the previous posts, shut down in the middle of the interstate (6 times) Check engine light opn constantly, the maddining alarm that comes on, over $3000 in rental cost for down time the numerous times we have had it in to be fixed. They put a new transmission (alledgedly) in Feb 2013...the check engine light AND the alarm came on on the way back to our shop May 8 2013 the truck started slamming into 2nd and 3rd gear and would notgo into reverse, In for another "new" transmission that is suppose to be the fix to the fix to the fix that didnt work by the Best and brightest of the Mitsubishi Engineers.

G. jr [ May 31, 2013 @ 06:28PM ]

nothin but problems with this truck, towed 3 times, dealer replaced trans 3 times, 19000 on this truck, just signed the papers for a new hino, stay far away from the fuso!!!

H. dick n [ August 07, 2013 @ 07:42AM ]

We have seven Fusos in our fleet of twenty-six class five trucks, including 2011 and 12 Fuso models and they are a disaster! We estimate we have lost revenue in the order of $150,000 in the last year solely resulting from down time with the Fusos. It is difficult to believe that in this day and age, such appalling product quality could exist. And, with respected names like Mitsubishi and Daimler Benz behind the Fuso, it's absurd!!!!

I. darin [ September 06, 2013 @ 07:16AM ]

posted 9 months ago truck no better. 167000 kl on transmition number three and constant warning light every day. dealer always ready to fix but truck never really gets fixed. fuso had 50 trucks and 33 technitions in Quebec last winter trying to figure out how to get them to run properly. im now looking for some other brand that is localy serviceable. best truck I ever had was a 2001 hino . put a million km 0 2 of them. shall try canadian motor vehicle arbitration and lawyer to to get fuso to buy back my truck.

J. db0251 [ October 11, 2013 @ 06:41AM ]

44

Purchased a NEW 2012 FE and have had nothing but problems. replaced 5 transmissions and the 6th one scheduled to be installed. tried to trade it in but no one even the dealer I have purchased trucks from for 10 years. They know it is bad. Trouble with transmissions, computers, fuel system.

K. Neil Sundberg [ December 27, 2013 @ 06:32PM ]

judging by the responses to this article I apparently made a big mistake buying my 2012 Fuso . So what solutions is Mitsubishi working on for this problem? I would think a redesign of the tranny might be in order given the track record of it so far. I have not had any probems so far except that it doesn't seem to always shift down when it should. But it only has less than 3k miles on it. Please feel free to email me . I would like to talk privately with some of you about this and what I might do to avoid issues or at least minimize them

L. Jesse [ March 03, 2014 @ 10:59PM ]

The euro 5 canter is the Biggest price of shit in the world wouldn't have one even if I was given to me with all the engine faults and trans faults

The fuso fighters on the other hand are a bullet prof truck

M. Jesse [ March 03, 2014 @ 11:00PM ]

Price of shit

N. Jesse [ March 03, 2014 @ 11:03PM ]

The euro 5 canter is the Biggest piece of shit the world ATM .. I wouldn't take one if it was given to me .. Fucking shit truck with all the engine and transmission problems..

On the other hand the fuso fighters are a bullet prof truck that I would highly recommend

O. Colleen Trotter [ June 09, 2014 @ 07:03PM ]

Two transmissions now since 2012. Two flush throughs. Wiring harness. Towed three times in limp mode. Eight tows in two years. We have spent so much on DEF fluid on this truck vs. the others. We all need to get together

45

for a class action suit on this truck. It is a lemon for sure. BBB get ready cause here we come. This totally affects our business. We have three locations 1 1/2 hours away from each other and when one of our three trucks go down the other location has to cover if possible. We have lost so much business canceling jobs because the truck went down. By the time we can service a customer they found someone else and have a bad taste in their mouths for junk king. We would have been there with positive reviews and referrals had we not bought a Mitsubishi. Looking at the other reviews it is very clear that the Mitsubishi is pushing this problem into outer space and just willing it away because they may go bankrupt replacing all the lemons they produced in 2012! They will replace our transmissions or flush the transmission 10 times over before getting to the bottom line. Is someone an attorney who can put together a class action suit on our behalf? We need to act. We can't afford to lose our livelihood .

P. Grayson [ July 20, 2014 @ 09:10PM ]

I am a new owner. Ordered, 01-01-14
Finally arrived and picked up, 06-01-14. As of yet, 07-14 it's been in the shop for a clunky shifting transmission more than I have used it. I own a landscape business, bought this new truck to be our new #1 truck to replace the dinosaur f450.
What a 70k joke and mistake I made buying this piece of junk. It's not equal by any means and now I need to seriously think about jointing this law suite. It is the worst truck I ever have driven. I am waiting on a response from fuso-mits.
Grayson

http://www.worktruckonline.com/article/story/2012/01/mitsubishi-fuso-reinvents-its-fe-fg-cabover-series/page/5.aspx (last visited 9/12/2014).

## CLASS ACTION ALLEGATIONS

137.   Plaintiffs bring this action on behalf of themselves and all others

similarly situated, pursuant to Rule 23 of the Federal Rules of Civil Procedure.

138.   Plaintiffs bring this action on behalf of the following class ("Class"):

All individuals or entities in the United States who leased or

46

purchased, not for resale, MFTA trucks having the BlueTec® SCR technology Engine.

In the alternative, Plaintiffs bring this action on behalf of the following state

Classes:

Florida Class:  All individuals or entities in Florida who leased or purchased, not for resale, MFTA trucks having the BlueTec® SCR technology Engine.

New Jersey Class:  All individuals or entities in New Jersey who leased or purchased, not for resale, MFTA trucks having the BlueTec® SCR technology Engine.

California Class:  All individuals or entities in California who leased or purchased, not for resale, MFTA trucks having the BlueTec® SCR technology Engine.

Ohio Class:  All individuals or entities in Ohio who leased or purchased, not for resale, MFTA trucks having the BlueTec® SCR technology Engine.

Pennsylvania Class:  All individuals or entities in Pennsylvania who leased or purchased, not for resale, MFTA trucks having the BlueTec® SCR technology Engine.

Excluded from the Classes are: (a) Defendant, including any entity in which

Defendant has a controlling interest, and its representatives, officers, directors,

employees, assigns and successors; (b) any person who has suffered a personal

injury or is alleged to have suffered personal injury as a result of using the Engine;

(c) any person or entity who has settled or released these same claims against

Defendant as evidenced by a written release; and (d) the Judge to whom this case is

assigned.

139.   <u>Numerosity/Impracticability of Joinder</u>:  The members of the Classes

are so numerous that joinder of all members would be impracticable.  The

proposed Classes include, at a minimum, thousands of members.  The precise

number of Class members can be ascertained by reviewing documents in

Defendant's possession, custody and control or otherwise obtained through

reasonable means.

140.   <u>Commonality and Predominance</u>:  There are common questions of

law or fact which predominate over any questions affecting only individual

members of the Classes.  These common legal or factual questions, include, but are

not limited to the following:

a.   whether Defendant engaged in a pattern of fraudulent,

deceptive and misleading conduct;

b.   whether Defendant's acts and omissions violated the consumer

fraud acts;

c.   whether Defendant made material misrepresentations of fact or

omitted stating material facts to Plaintiffs and the Classes regarding the defect in

Defendant's Engines;

d.   whether Defendant's false and misleading statements of fact

and concealment of material facts regarding the defect in the Engines were

48

intended to deceive the public;

> e.     whether Defendant breached its express and implied warranties;

> f.     whether, as a result of Defendant's misconduct, Plaintiffs and the Classes are entitled to equitable relief and other relief, and, if so, the nature of such relief; and

> g.     whether the Plaintiffs and members of the Classes have sustained ascertainable loss and damages as a result of Defendant's acts and omissions, and the proper measure thereof.

141.    <u>Typicality</u>:  The representative Plaintiffs' claims are typical of the claims of the members of the Classes they seek to represent. Plaintiffs and members of the Classes have been injured by the same wrongful practices in which Defendant has engaged. Plaintiffs' claims arise from the same practices and course of conduct that give rise to the claims of the members of the Classes and are based on the same legal theories.

142.    <u>Adequacy</u>:  Plaintiffs are representatives that will fully and adequately assert and protect the interests of the Classes, and have retained class counsel who are experienced and qualified in prosecuting class actions.  Neither Plaintiffs nor their attorneys have any interests which are contrary to or conflicting with the Classes.

143.    <u>Superiority</u>:  A class action is superior to all other available methods

49

for the fair and efficient adjudication of this lawsuit, because individual litigation of the claims of all Class members is economically unfeasible and procedurally impracticable.  While the aggregate damages sustained by the Classes are likely in the millions of dollars, the individual damages incurred by each Class member resulting from Defendant's wrongful conduct are too small to warrant the expense of individual suits.  The likelihood of individual Class members prosecuting their own separate claims is remote, and, even if every Class member could afford individual litigation, the court system would be unduly burdened by individual litigation of such cases.  Individual members of the Classes do not have a significant interest in individually controlling the prosecution of separate actions, and individualized litigation would also present the potential for varying, inconsistent, or contradictory judgments and would magnify the delay and expense to all of the parties and to the court system because of multiple trials of the same factual and legal issues.  Plaintiffs know of no difficulty to be encountered in the management of this action that would preclude its maintenance as a class action. In addition, Defendant has acted or refused to act on grounds generally applicable to the Classes and, as such, final injunctive relief or corresponding declaratory relief with regard to the members of the Classes as a whole is appropriate.

144.   In the alternative, Plaintiffs seek certification pursuant to Rule 23(c)(4) on the issues of:  (a) whether Defendant breached its uniform warranty

50

contracts with Plaintiffs and the Class; and (b) whether Defendant engaged in deceptive, confusing or misleading practices in connection with the sale and warranting of the trucks.

## COUNT I
## VIOLATIONS OF NEW JERSEY CONSUMER FRAUD ACT
## (N.J.S.A. § 56:8-1, *et seq.*)

145.   Plaintiffs incorporate the allegations set forth above as if fully set forth herein.

146.   Legend and Defendant are "persons" within the meaning of the New Jersey Consumer Fraud Act ("CFA").

147.   Legend and the members of the Class are "consumers" within the meaning of the CFA.

148.   At all relevant times material hereto, Defendant conducted trade and commerce in New Jersey and elsewhere within the meaning of the CFA.

149.   The CFA is, by its terms, a cumulative remedy, such that remedies under its provisions can be awarded in addition to those provided under separate statutory schemes.

150.   Defendant's practices violated the CFA for, *inter alia*, one or more of the following reasons:

   a.   Defendant concealed from Legend and the New Jersey Class the material facts that the Engines were (and are) defective and, as such, the

51

vehicles and Engines were not of merchantable quality; and

        b.      Defendant engaged in unconscionable commercial practices in failing to disclose material information discussed above about the Engines.

151.   Defendant consciously omitted to disclose material facts to Legend and the New Jersey Class with respect to the defective Engines.

152.   Defendant's unconscionable conduct described herein included the omission and concealment of material facts concerning the defective Engines, as well as the affirmative misrepresentation that the Engines "will provide . . . unparalleled operational stability and reliability."

153.   Defendant intended that Legend and the New Jersey Class rely on its acts of concealment and omissions and misrepresentations, so that Legend and the Class would purchase and/or lease the Engines.

154.   Had Defendant disclosed all material information regarding the defective Engines to Legend and the New Jersey Class, they would not have purchased and/or leased the Engines, or would have paid less.

155.   The foregoing acts, omissions and practices proximately caused Legend and the New Jersey Class to suffer an ascertainable loss in the form of, *inter alia*, added expense to continuously remove, repair and replace the defective Engines, diminution of value, loss of use of the Engines, as well as towing and other expenses, and they are entitled to recover such damages, together with

appropriate penalties, including treble damages, attorneys' fees and costs of suit.

## COUNT II
## BREACH OF EXPRESS WARRANTY
## (N.J. Stat. Ann. § 12A:2-313)

156.   Legend incorporates the allegations set forth above as if fully set forth herein.

157.   As an express warrantor and manufacturer and merchant, Defendant had certain obligations under N.J. Stat. Ann. § 12A:2-313 to conform the Engines and transmissions to the express warranties.

158.   When Legend and the members of the New Jersey Class purchased and/or leased the vehicles with the Engines, Defendant expressly warranted that it would repair defects in the Engines and transmissions.  MFTA also warranted that the Engines would exhibit "operational stability and reliability."

159.   The defects at issue in this litigation was present at the time of sale and lease to Legend and members of the New Jersey Class.

160.   Defendant breached its emissions warranty and other express warranties (and continues to breach these warranties) because it has not and cannot deliver a conforming, non-defective truck to Legend and New Jersey Class members even after repeated repairs and replacements of component parts.  In addition, Defendant did not (and does not) cover the expenses associated with replacing the defective Engines in Legend's and New Jersey Class members'

vehicles. Defendant further breached these express warranties because the same

Engines and the same defective emissions and regeneration systems were placed in

vehicles during purported repairs.

161.   Pursuant to the express warranties, Defendant was obligated to pay for

or reimburse Legend and the New Jersey Class members for out-of-service costs

and costs incurred in replacing the defective Engines.

162.   Pursuant to the express warranties, Defendant also was obligated to

repair the defective Engines and transmissions.

163.   Defendant and its authorized agents, the dealers, have failed and

refused to conform the Engines to the express warranties and Defendant's conduct,

as discussed throughout this Complaint, has voided any attempt on its part to

disclaim liability for its actions.

164.   Legend used the Engines in a manner consistent with their intended

use and has performed each and every duty required under the terms of the

warranties, except as may have been excused or prevented by the conduct of

Defendant or by operation of law in light of Defendant's unconscionable conduct

described throughout this Complaint.

165.   Defendant received timely notice regarding the problems at issue in

this litigation and, notwithstanding such notice, has failed and refused to offer an

effective remedy.

166.   In addition, Defendant has received, on information and belief, thousands of complaints and other notices from customers advising it of the defect at issue in this litigation.

167.   In its capacity as a supplier and/or warrantor, and by the conduct described herein, any attempt by Defendant to limit its express warranties in a manner that would exclude or limit coverage for the defect in the Engines that was present as of the time of sale or lease, which Defendant knew about prior to offering the Engines for sale, which Defendant concealed, did not disclose, and did not remedy prior to sale or lease (or afterward), is unconscionable, and any such effort to disclaim or otherwise limit liability for the defect at issue is null and void.

168.   Accordingly, Legend and the New Jersey Class members suffered damages caused by Defendant's breach of the express warranties and are entitled to recover damages as set forth herein.

## COUNT III
## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
### (N.J. Stat. Ann. § 12A:2-314)

169.   Legend incorporates the allegations set forth above as if fully set forth herein.

170.   Defendant is and was at all relevant times a merchant with respect to the Engines.

171.   A warranty that the Engines were in merchantable quality and

condition is implied by law pursuant to N.J. Stat. Ann. § 12A:2-314.

172.   Defendant impliedly warranted that the Engines were of good and merchantable condition and quality – fit and safe for their ordinary intended use.

173.   The Engines were defective at the time they left the possession of Defendant, as set forth above and Defendant knew of this defect at the time these transactions occurred. Thus, the Engines and transmissions, when sold and at all times thereafter, were not in merchantable condition or quality and are not fit for their ordinary intended purpose.

174.   By virtue of the conduct described herein and throughout this Complaint, Defendant breached the implied warranty of merchantability.

175.   Legend and New Jersey Class members have been damaged as a direct and proximate result of Defendant's breach of the implied warranty.

176.   Legend has used the Engines in a manner consistent with their intended use and performed each and every duty required under the terms of the warranties, except as may have been excused or prevented by the conduct of Defendant or by operation of law in light of Defendant's conduct.

177.   Defendant received timely notice regarding the problems at issue in this litigation and, notwithstanding such notice, failed and refused to offer an effective remedy.

178.   In addition, Defendant has received, on information and belief,

56

thousands of complaints and other notices from customers advising of the defect associated with the Engines.

179.   Legend has had sufficient dealings with either Defendant or its authorized dealers to establish privity of contract.  The dealers were not intended to be the ultimate consumers of the Engines and have no rights under the warranty agreements provided with the Engines.  In addition, the trucks were sold or leased directly to Legend and New Jersey Class members by Defendant pursuant to dealer financing and floor plan financing arrangements, so that title directly passed from Defendant to Legend and New Jersey Class members, thus establishing privity. Moreover, the federally-mandated emissions warranty was and is transferrable to subsequent purchasers within the five-year warranty period, meaning that the implied warranty also follows the emissions warranty.  Notwithstanding this, privity is not required in this case because Legend and the New Jersey Class members are intended third-party beneficiaries of contracts between MFTA and its dealers; specifically, they are intended beneficiaries of Defendant's implied warranties. The warranty agreements were designed for and intended to benefit the ultimate consumers only.

180.   As a direct and proximate result of Defendant's breach of warranties, Legend and the Class were caused to suffer economic damage, including loss attributable to the loss of their warranty investment value, the diminished value of

their Engines, loss of use, as well as the monies spent and to be spent to repair and/or replace their Engines.

## COUNT IV
## BREACH OF IMPLIED COVENANT OF GOOD FAITH
## AND FAIR DEALING

181.   Legend incorporates the allegations set forth above as if fully set forth herein.

182.   Legend and the New Jersey Class entered into agreements to purchase trucks having the BlueTec® SCR Engines with Defendant, or otherwise were in contractual privity with Defendant as a result of the express warranties described herein.

183.   The contracts and warranties were subject to the implied covenant that Defendant would conduct business with Legend and the New Jersey Class in good faith and would deal fairly with them.

184.   Defendant breached those implied covenants by selling Legend and the New Jersey Class defective Engines, when it knew, or should have known, that the contracts and/or warranties were unconscionable and by abusing its discretion in the performance of the contract or by intentionally subjecting Legend and the New Jersey Class to a risk (the defective Engines) beyond that which they would have contemplated at the time of purchase, as well as by failing to provide for proper parts and service of the Engines it sold.

58

185.   As a direct and proximate result of Defendant's breach of the duty of good faith and fair dealing, Legend and the New Jersey Class have suffered damages.

## COUNT V
## BREACH OF EXPRESS WARRANTY
### (On Behalf of California Class)

186.   Encore incorporates the allegations set forth above as if fully set forth herein.

187.   As an express warrantor and manufacturer and merchant, Defendant had certain obligations under California Commercial Code § 2313 to conform the Engines and transmissions to the express warranties.

188.   When Encore and the members of the California Class purchased and/or leased the vehicles with the Engines, Defendant expressly warranted under its warranty that it would repair defects in the Engines and transmissions.  MFTA also warranted that the Engines would exhibit "operational stability and reliability."

189.   The defect at issue in this litigation was present at the time of sale and lease to Encore and members of the California Class.

190.   Defendant breached its emissions warranty and other express warranties (and continues to breach these warranties) because it has not and cannot deliver a conforming, non-defective truck to Encore and the California Class

members even after repeated repairs and replacements of component parts. In addition, Defendant did not (and does not) cover the expenses associated with replacing the defective Engines in Encore's and the California Class members' vehicles. Defendant further breached these express warranties because the same Engines and the same defective emissions and regeneration systems were placed in vehicles during purported repairs.

191.   Pursuant to the express warranties, Defendant was obligated to pay for or reimburse Encore and the California Class members for out-of-service costs and costs incurred in replacing the defective Engines.

192.   Pursuant to the express warranties, Defendant also was obligated to repair the defective Engines and transmissions.

193.   Defendant and its authorized agents, the dealers, have failed and refused to conform the Engines to the express warranties and Defendant's conduct, as discussed throughout this Complaint, has voided any attempt on its part to disclaim liability for its actions.

194.   Encore used the Engines in a manner consistent with their intended use and has performed each and every duty required under the terms of the warranties, except as may have been excused or prevented by the conduct of Defendant or by operation of law in light of Defendant's unconscionable conduct described throughout this Complaint.

195.   Defendant received timely notice regarding the problems at issue in this litigation and, notwithstanding such notice, has failed and refused to offer an effective remedy.

196.   In addition, Defendant has received, on information and belief, thousands of complaints and other notices from customers advising it of the defect at issue in this litigation.

197.   In its capacity as a supplier and/or warrantor, and by the conduct described herein, any attempt by Defendant to limit its express warranties in a manner that would exclude or limit coverage for the defect in the Engines that was present as of the time of sale or lease, which Defendant knew about prior to offering the Engines for sale, which Defendant concealed, did not disclose, and did not remedy prior to sale or lease (or afterward), is unconscionable, and any such effort to disclaim or otherwise limit liability for the defect at issue is null and void.

198.   Accordingly, Encore and the California Class members suffered damages caused by Defendant's breach of the express warranties and are entitled to recover damages as set forth herein.

## COUNT VI
## BREACH OF IMPLIED WARRANTY
### (On Behalf of California Class)

199.   Encore incorporates the allegations set forth above as if fully set forth herein.

200.   Defendant is and was at all relevant times a merchant with respect to the Engines.

201.   A warranty that the Engines were in merchantable quality and condition is implied by law pursuant to California Commercial Code § 2314.

202.   Defendant impliedly warranted that the Engines were of good and merchantable condition and quality – fit and safe for their ordinary intended use, namely, providing reliable transportation.

203.   The Engines were defective at the time they left the possession of Defendant, as set forth above. Defendant knew of this defect at the time these transactions occurred. Thus, the Engines and transmissions, when sold and at all times thereafter, were not in merchantable condition or quality and are not fit for their ordinary intended purpose.

204.   By virtue of the conduct described herein and throughout this Complaint, Defendant breached the implied warranty of merchantability.

205.   Encore and the California Class members have been damaged as a direct and proximate result of Defendant's breach of the implied warranty.

206.   Encore has used the Engines in a manner consistent with their intended use and performed each and every duty required under the terms of the warranties, except as may have been excused or prevented by the conduct of Defendant or by operation of law in light of Defendant's conduct.

207.   Defendant received timely notice regarding the problems at issue in this litigation and, notwithstanding such notice, failed and refused to offer an effective remedy.

208.   In addition, Defendant has received, on information and belief, thousands of complaints and other notices from customers advising of the defect associated with the Engines.

209.   Encore has had sufficient dealings with either Defendant or its authorized dealers to establish privity of contract.  The dealers were not intended to be the ultimate consumers of the Engines and have no rights under the warranty agreements provided with the Engines.  In addition, the trucks were sold or leased directly to Encore and California Class members by Defendant pursuant to dealer financing and floor plan financing arrangements, so that title directly passed from Defendant to Encore and California Class members, thus establishing privity. Moreover, the federally-mandated emissions warranty was and is transferrable to subsequent purchasers within the five-year warranty period, meaning that the implied warranty also follows the emissions warranty.  Notwithstanding this, privity is not required in this case because Encore and the California Class members are intended third-party beneficiaries of contracts between MFTA and its dealers; specifically, they are intended beneficiaries of Defendant's implied warranties. The warranty agreements were designed for and intended to benefit the

63

ultimate consumers only.

210.   As a direct and proximate result of Defendant's breach of warranties,

Encore and the California Class were caused to suffer economic damage, including

loss attributable to the loss of their warranty investment value, the diminished

value of their Engines, loss of use, as well as the monies spent and to be spent to

repair and/or replace their Engines.

**COUNT VII**
**VIOLATION OF THE CALIFORNIA UNFAIR**
**COMPETITION LAW**
**(On Behalf of California Class)**

211.   California Plaintiffs and the California Class incorporate the

allegations set forth above as if fully set forth herein.

212.   California Business and Professions Code § 17200, the Unfair

Competition Law, prohibits any "unlawful, unfair, or fraudulent business act or

practices."  Defendant has engaged in unlawful, fraudulent, and unfair business

acts and practices in violation of this law.

213.   Defendant has violated the unlawful prong of § 17200 by its

violations of the Consumer Legal Remedies Act, California Civil Code § 1750, *et*

*seq*., as set forth above, and various warranty statutes, as set forth below.

214.   Defendant has violated the fraudulent prong of § 17200 because the

omissions regarding the defective nature of the Engine and its emissions and

regeneration system, as set forth in this Complaint, were likely to deceive a

64

reasonable consumer, and the information would be material to a reasonable consumer.

215.   Defendant has violated the unfair prong of § 17200 because the acts and practices set forth in the Complaint, including the manufacture and sale of the defective Engine and its defective emissions and regeneration system, its failure to adequately disclose and remedy that defect, and Defendant's misrepresentations regarding the defective nature of the Engine and its emissions and regeneration system, offend established public policy, and because the harm these acts and practices cause to consumers greatly outweighs any benefits associated with those practices. Defendant's conduct has also impaired competition within the heavy duty, on-highway vehicles market and has prevented Encore and the California Class from making fully informed decisions about whether to purchase or lease vehicles equipped with the Engines and/or the price to be paid to purchase or lease those vehicles.

216.   Encore has standing to pursue this claim on behalf of the California Class because it has suffered an injury in fact, including the loss of money or property, as a result of and in reliance on Defendant's unfair, unlawful, and deceptive practices. As set forth above regarding Encore, had Defendant disclosed the defect with the Engine and its emission and regeneration system prior to Encore's purchase, it would not have purchased a vehicle equipped with the

Engine or not have paid as much for the vehicle. In addition, Encore has expended money related to the engine defect and has suffered a diminution in value of its vehicle.

217. All of the wrongful conduct alleged herein occurred, and continues to occur, in the conduct of Defendant's business. Defendant's wrongful conduct is part of a pattern or generalized course of conduct that is still perpetuated and repeated in the State of California.

218. Encore and the California Class request that this Court enter such orders or judgments as may be necessary to enjoin Defendant from continuing its unfair, unlawful, and/or deceptive practices and to restore to Encore and the California Class any money Defendant acquired by unfair competition, including restitution and/or restitutionary disgorgement, as provided in California Business and Professions Code § 17203 and California Civil Code § 3345, and for such other relief set forth below.

<u>COUNT VIII</u>
**VIOLATIONS OF FLORIDA UNFAIR AND DECEPTIVE TRADE PRACTICES ACT**
**(On Behalf of Florida Class)**

219. Q+Food incorporates the allegations set forth above as if fully set forth herein.

220. Defendant's business acts and practices alleged herein constitute unfair, unconscionable and/or deceptive methods, acts or practices under the

66

Florida Unfair and Deceptive Trade Practices Act, § 501.201, *et seq*., Florida Statutes ("FUDTPA").

221.   Q+Food and the members of the Florida Class are "consumers" within the meaning of the FUDTPA.

222.   At all relevant times material hereto, Defendant conducted trade and commerce in Florida and elsewhere within the meaning of the FUDTPA.

223.   Defendant's practices violated the FUDTPA for, *inter alia*, one or more of the following reasons:

a.   Defendant concealed from Q+Food and the Florida Class the material facts that the Engines were defective and, as such, the vehicles and Engines were not of merchantable quality; and

b.   Defendant engaged in unconscionable commercial practices in failing to disclose material information discussed above about the Engines.

224.   Defendant consciously omitted to disclose material facts to Q+Food and the Florida Class with respect to the defective Engines.

225.   Defendant's unconscionable conduct described herein included the omission and concealment of material facts concerning the defective Engines, as well as the affirmative misrepresentation that the Engines "will provide . . . unparalleled operational stability and reliability."

226.   Defendant intended that Q+Food and the Florida Class rely on its acts

of concealment and omissions and misrepresentations, so that Q+Food and the

Florida Class would purchase and/or lease vehicles with the Engines.

227.   Had Defendant disclosed all material information regarding the

defective Engines to Q+Food and the Florida Class members, they would not have

purchased and/or leased vehicles with the Engines, or would have paid less for the

vehicles.

228.   The foregoing acts, omissions and practices proximately caused

Q+Food and the Florida Class to suffer an ascertainable loss in the form of, *inter*

*alia*, added expense to continuously remove, repair and replace the defective

Engines, diminution of value, loss of use of the Engines, as well as towing and

other expenses, and they are entitled to recover such damages, together with

appropriate penalties, including treble damages, attorneys' fees and costs of suit.

229.   Pursuant to this statute, Plaintiff will serve the Florida Attorney

General with a copy of this Amended Class Action Complaint, as Q+Food seeks

injunctive and declaratory relief.

## COUNT IX
## BREACH OF EXPRESS WARRANTY
### (On Behalf of Florida Class)

230.   Plaintiff incorporates the allegations set forth above as if fully set

forth herein.

231.   As an express warrantor and manufacturer and merchant, Defendant

had certain obligations under Fla. Stat. § 672.313 to conform the Engines and transmissions to the express warranties.

232.   When Q+Food and the members of the Florida Class purchased and/or leased the vehicles with the Engines, Defendant expressly warranted under its warranty that it would repair defects in the Engines and transmissions.  MFTA also warranted that the Engines would exhibit "operational stability and reliability."

233.   The defect at issue in this litigation was present at the time of sale and lease to Q+Food and members of the Florida Class.

234.   Defendant breached its emissions warranty and other express warranties (and continues to breach these warranties) because it has not and cannot deliver a conforming, non-defective truck to Q+Food and Florida Class members, even after repeated repairs and replacements of component parts.  In addition, Defendant did not (and does not) cover the expenses associated with replacing the defective Engines in Q+Food's and Florida Class members' vehicles. Defendant further breached these express warranties because the same Engines and the same defective emissions and regeneration systems were placed in vehicles during purported repairs.

235.   Pursuant to the express warranties, Defendant was obligated to pay for or reimburse Q+Food and the Florida Class members for out-of-service costs and costs incurred in replacing the defective Engines.

236.   Pursuant to the express warranties, Defendant also was obligated to repair the defective Engines and transmissions.

237.   Defendant and its authorized agents, the dealers, have failed and refused to conform the Engines to the express warranties and Defendant's conduct, as discussed throughout this Complaint, has voided any attempt on its part to disclaim liability for its actions.

238.   Q+Food used the Engines in a manner consistent with their intended use and has performed each and every duty required under the terms of the warranties, except as may have been excused or prevented by the conduct of Defendant or by operation of law in light of Defendant's unconscionable conduct described throughout this Complaint.

239.   Defendant received timely notice regarding the problems at issue in this litigation and, notwithstanding such notice, has failed and refused to offer an effective remedy.

240.   In addition, Defendant has received, on information and belief, thousands of complaints and other notices from customers advising it of the defect at issue in this litigation.

241.   In its capacity as a supplier and/or warrantor, and by the conduct described herein, any attempt by Defendant to limit its express warranties in a manner that would exclude or limit coverage for the defect in the Engines that was

70

present as of the time of sale or lease, which Defendant knew about prior to

offering the Engines for sale, which Defendant concealed, did not disclose, and did

not remedy prior to sale or lease (or afterward), is unconscionable, and any such

effort to disclaim or otherwise limit liability for the defect at issue is null and void.

242.   Accordingly, Q+Food and the Florida Class members suffered

damages caused by Defendant's breach of the express warranties and are entitled

to recover damages as set forth herein.

## COUNT X
## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
### (On Behalf of Florida Class)

243.   Plaintiff incorporates the allegations set forth above as if fully set

forth herein.

244.   Defendant is and was at all relevant times a merchant with respect to

the Engines.

245.   A warranty that the Engines were in merchantable quality and

condition is implied by law pursuant to Fla. Stat. § 672.314.

246.   Defendant impliedly warranted that the Engines were of good and

merchantable condition and quality – fit and safe for their ordinary intended use.

247.   The Engines were defective at the time they left the possession of

Defendant, as set forth above. Defendant knew of this defect at the time these

transactions occurred. Thus, the Engines and transmissions, when sold and at all

times thereafter, were not in merchantable condition or quality and are not fit for their ordinary intended purpose.

248.   By virtue of the conduct described herein and throughout this Complaint, Defendant breached the implied warranty of merchantability.

249.   Q+Food and Florida Class members have been damaged as a direct and proximate result of Defendant's breach of the implied warranty.

250.   Q+Food has used the Engines in a manner consistent with their intended use and performed each and every duty required under the terms of the warranties, except as may have been excused or prevented by the conduct of Defendant or by operation of law in light of Defendant's conduct.

251.   Defendant received timely notice regarding the problems at issue in this litigation and, notwithstanding such notice, has failed and refused to offer an effective remedy.

252.   In addition, Defendant has received, on information and belief, thousands of complaints and other notices from customers advising of the defect associated with the Engines.

253.   Q+Food has had sufficient dealings with either Defendant or its authorized dealers to establish privity of contract.  The dealers were not intended to be the ultimate consumers of the Engines and have no rights under the warranty agreements provided with the Engines.  In addition, the trucks were sold or leased

72

directly to Q+Food and Florida Class members by Defendant pursuant to dealer
financing and floor plan financing arrangements, so that title directly passed from
Defendant to Q+Food and Florida Class members, thus establishing privity.
Moreover, the federally-mandated emissions warranty was and is transferrable to
subsequent purchasers within the five-year warranty period, meaning that the
implied warranty also follows the emissions warranty.  Notwithstanding this,
privity is not required in this case because Q+Food and the Florida Class members
are intended third-party beneficiaries of contracts between MFTA and its dealers;
specifically, they are intended beneficiaries of Defendant's implied warranties. The
warranty agreements were designed for and intended to benefit the ultimate
consumers only.

254.   As a direct and proximate result of Defendant's breach of warranties,
Q+Food and the Florida Class were caused to suffer economic damage, including
loss attributable to the loss of their warranty investment value, the diminished
value of their Engines, loss of use, as well as the monies spent and to be spent to
repair and/or replace their Engines.

## COUNT XI
## BREACH OF EXPRESS WARRANTY
### (On Behalf of Ohio Class)

255.   All American incorporates the allegations set forth above as if fully
set forth herein.

73

256.   As an express warrantor and manufacturer and merchant, Defendant had certain obligations under Ohio Rev.Code § 1302.26 to conform the Engines and transmissions to the express warranties.

257.   When All American and the members of the Ohio Class purchased and/or leased the vehicles with the Engines, Defendant expressly warranted under its warranty that it would repair defects in the Engines and transmissions.  MFTA also warranted that the Engines would exhibit "operational stability and reliability."

258.   The defect at issue in this litigation was present at the time of sale and lease to All American and members of the Ohio Class.

259.   Defendant breached its emissions warranty and other express warranties (and continues to breach these warranties) because it has not and cannot deliver a conforming, non-defective truck to All American and the Ohio Class members, even after repeated repairs and replacements of component parts.  In addition, Defendant did not (and does not) cover the expenses associated with replacing the defective Engines in All American's and the Ohio Class members' vehicles.  Defendant further breached these express warranties because the same Engines and the same defective emissions and regeneration systems were placed in their vehicles during purported repairs.

260.   Pursuant to the express warranties, Defendant was obligated to pay for

74

or reimburse All American and the Ohio Class members for out-of-service costs and costs incurred in replacing the defective Engines.

261.   Pursuant to the express warranties, Defendant also was obligated to repair the defective Engines and transmissions.

262.   Defendant and its authorized agents, the dealers, have failed and refused to conform the Engines to the express warranties and Defendant's conduct, as discussed throughout this Complaint, has voided any attempt on its part to disclaim liability for its actions.

263.   All American used the Engines in a manner consistent with their intended use and has performed each and every duty required under the terms of the warranties, except as may have been excused or prevented by the conduct of Defendant or by operation of law in light of Defendant's unconscionable conduct described throughout this Complaint.

264.   Defendant received timely notice regarding the problems at issue in this litigation and, notwithstanding such notice, has failed and refused to offer an effective remedy.

265.   In addition, Defendant has received, on information and belief, thousands of complaints and other notices from customers advising it of the defect at issue in this litigation.

266.   In its capacity as a supplier and/or warrantor, and by the conduct

described herein, any attempt by Defendant to limit its express warranties in a manner that would exclude or limit coverage for the defect in the Engines that was present as of the time of sale or lease, which Defendant knew about prior to offering the Engines for sale, which Defendant concealed, did not disclose, and did not remedy prior to sale or lease (or afterward), is unconscionable, and any such effort to disclaim or otherwise limit liability for the defect at issue is null and void.

267.   Accordingly, All American and the Ohio Class members suffered damages caused by Defendant's breach of the express warranties and are entitled to recover damages as set forth herein.

## COUNT XII
## BREACH OF IMPLIED WARRANTY
### (On Behalf of Ohio Class)

268.   All American incorporates the allegations set forth above as if fully set forth herein.

269.   Defendant is and was at all relevant times a merchant with respect to the Engines.

270.   A warranty that the Engines were in merchantable quality and condition is implied by law pursuant to Ohio Rev. Code § 1302.27.

271.   Defendant impliedly warranted that the Engines were of good and merchantable condition and quality – fit and safe for their ordinary intended use, namely, providing reliable transportation.

76

272.   The Engines were defective at the time they left the possession of Defendant, as set forth above. Defendant knew of this defect at the time these transactions occurred. Thus, the Engines and transmissions, when sold and at all times thereafter, were not in merchantable condition or quality and are not fit for their ordinary intended purpose.

273.   By virtue of the conduct described herein and throughout this Complaint, Defendant breached the implied warranty of merchantability.

274.   All American and the Ohio Class members have been damaged as a direct and proximate result of Defendant's breach of the implied warranty.

275.   All American has used the Engines in a manner consistent with their intended use and performed each and every duty required under the terms of the warranties, except as may have been excused or prevented by the conduct of Defendant or by operation of law in light of Defendant's conduct.

276.   Defendant received timely notice regarding the problems at issue in this litigation and, notwithstanding such notice, has failed and refused to offer an effective remedy.

277.   In addition, Defendant has received, on information and belief, thousands of complaints and other notices from customers advising of the defect associated with the Engines.

278.   All American has had sufficient dealings with either Defendant or its

77

authorized dealers to establish privity of contract.  The dealers were not intended to be the ultimate consumers of the Engines and have no rights under the warranty agreements provided with the Engines.  In addition, the trucks were sold or leased directly to All American and Ohio Class members by Defendant pursuant to dealer financing and floor plan financing arrangements, so that title directly passed from Defendant to All American and Ohio Class members, thus establishing privity. Moreover, the federally-mandated emissions warranty was and is transferrable to subsequent purchasers within the five-year warranty period, meaning that the implied warranty also follows the emissions warranty.  Notwithstanding this, privity is not required in this case because All American and the Ohio Class members are intended third-party beneficiaries of contracts between MFTA and its dealers; specifically, they are intended beneficiaries of Defendant's implied warranties. The warranty agreements were designed for and intended to benefit the ultimate consumers only.

279.   As a direct and proximate result of Defendant's breach of warranties, All American and the Ohio Class were caused to suffer economic damage, including loss attributable to the loss of their warranty investment value, the diminished value of their Engines, loss of use, as well as the monies spent and to be spent to repair and/or replace their Engines.

<u>COUNT XIII</u>
**NEGLIGENT DESIGN/ENGINEERING/MANUFACTURING**
**(On Behalf of Ohio Class)**

280.   All American and the Ohio Class incorporate the allegations set forth above as if fully set forth herein.

281.   Defendant owed All American and the Ohio Class a non-delegable duty to exercise ordinary and reasonable care to properly design, engineer, and manufacture the Engines against foreseeable malfunctions and to design, engineer and manufacture the Engines emissions and regeneration systems so they would function normally. Defendant also owes a continuing duty to notify All American and the Ohio Class of the problem at issue and to repair the defects.

282.   The foreseeable hazards and malfunctions include, but are not limited to, repeated instances of derating and shutdown due to failed regeneration.

283.   All American and the Ohio Class were not aware of the Engine defect described above and its latent shortcomings, or the likelihood of damage therefrom arising in the normal use of vehicles equipped with the Engines.

284.   There existed, at all relevant times, alternative exhaust emission control component designs and engineering which were both technically and economically feasible. Further, any alleged benefits associated with Defendant's defective designs are vastly outweighed by the real risks which include the added expenses foisted upon All American and the Ohio Class by the defect.

79

285.   Defendant did not design, engineer, or manufacture its Engines with reasonable care.

286.   The Engines were defective as herein alleged at the time they left Defendant's factories.

287.   Defendant breached its duty owed to All American and the Ohio Class to design, manufacture, and engineer its Engines to be free of emission-related defects.

288.   As a direct and proximate result of this breach, All American and the Ohio Class have suffered damages.

289.   Accordingly, All American and the Ohio Class are entitled to recover appropriate damages including, but not limited to, diminution of value.

## COUNT XIV
## BREACH OF EXPRESS WARRANTY
### (Pa.C.S. § 2313)

290.   West Lumber incorporates the allegations set forth above as if fully set forth herein.

291.   As an express warrantor and manufacturer and merchant, Defendant had certain obligations under Pa.C.S. § 2313 to conform the Engines and transmissions to the express warranties.

292.   When West Lumber and the members of the Pennsylvania Class purchased and/or leased the vehicles with the Engines, Defendant expressly

warranted that it would repair defects in the Engines and transmissions.  MFTA

also warranted that the Engines would exhibit "operational stability and

reliability."

293.   The defect at issue in this litigation was present at the time of sale and

lease to West Lumber and members of the Pennsylvania Class.

294.   Defendant breached its emissions warranty and other express

warranties (and continues to breach these warranties) because it has not and cannot

deliver a conforming, non-defective truck to West Lumber and Pennsylvania Class

members even after repeated repairs and replacements of component parts.  In

addition, Defendant did not (and does not) cover the expenses associated with

replacing the defective Engines in West Lumber's and Pennsylvania Class

members' vehicles.  Defendant further breached these express warranties because

the same Engines and the same defective emissions and regeneration systems were

placed in vehicles during purported repairs.

295.   Pursuant to the express warranties, Defendant was obligated to pay for

or reimburse West Lumber and the Pennsylvania Class members for out-of-service

costs and costs incurred in replacing the defective Engines.

296.   Pursuant to the express warranties, Defendant also was obligated to

repair the defective Engines and transmissions.

297.   Defendant and its authorized agents, the dealers, have failed and

refused to conform the Engines to the express warranties and Defendant's conduct, as discussed throughout this Complaint, has voided any attempt on its part to disclaim liability for its actions.

298.   West Lumber used the Engines in a manner consistent with their intended use and has performed each and every duty required under the terms of the warranties, except as may have been excused or prevented by the conduct of Defendant or by operation of law in light of Defendant's unconscionable conduct described throughout this Complaint.

299.   Defendant received timely notice regarding the problems at issue in this litigation and, notwithstanding such notice, has failed and refused to offer an effective remedy.

300.   In addition, Defendant has received, on information and belief, thousands of complaints and other notices from customers advising it of the defect at issue in this litigation.

301.   In its capacity as a supplier and/or warrantor, and by the conduct described herein, any attempt by Defendant to limit its express warranties in a manner that would exclude or limit coverage for the defect in the Engines that was present as of the time of sale or lease, which Defendant knew about prior to offering the Engines for sale, which Defendant concealed, did not disclose, and did not remedy prior to sale or lease (or afterward), is unconscionable, and any such

effort to disclaim or otherwise limit liability for the defect at issue is null and void.

302.   Accordingly, West Lumber and the Pennsylvania Class members suffered damages caused by Defendant's breach of the express warranties and are entitled to recover damages as set forth herein.

<u>COUNT XV</u>
**BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY**
**(Pa.C.S § 2314)**

303.   West Lumber incorporates the allegations set forth above as if fully set forth herein.

304.   Defendant is and was at all relevant times a merchant with respect to the Engines.

305.   A warranty that the Engines were in merchantable quality and condition is implied by law pursuant to Pa.C.S § 2314.

306.   Defendant impliedly warranted that the Engines were of good and merchantable condition and quality – fit and safe for their ordinary intended use.

307.   The Engines were defective at the time they left the possession of Defendant, as set forth above. Defendant knew of this defect at the time these transactions occurred. Thus, the Engines and transmissions, when sold and at all times thereafter, were not in merchantable condition or quality and are not fit for their ordinary intended purpose.

308.   By virtue of the conduct described herein and throughout this

Complaint, Defendant breached the implied warranty of merchantability.

309.   West Lumber and Pennsylvania Class members have been damaged as a direct and proximate result of Defendant's breach of the implied warranty.

310.   West Lumber has used the Engines in a manner consistent with their intended use and performed each and every duty required under the terms of the warranties, except as may have been excused or prevented by the conduct of Defendant or by operation of law in light of Defendant's conduct.

311.   Defendant received timely notice regarding the problems at issue in this litigation and, notwithstanding such notice, has failed and refused to offer an effective remedy.

312.   In addition, Defendant has received, on information and belief, thousands of complaints and other notices from customers advising of the defect associated with the Engines.

313.   West Lumber has had sufficient dealings with either Defendant or its authorized dealers to establish privity of contract.  The dealers were not intended to be the ultimate consumers of the Engines and have no rights under the warranty agreements provided with the Engines.  In addition, the trucks were sold or leased directly to West Lumber and Pennsylvania Class members by Defendant pursuant to dealer financing and floor plan financing arrangements, so that title directly passed from Defendant to West Lumber and Pennsylvania Class members, thus

establishing privity.  Moreover, the federally-mandated emissions warranty was and is transferrable to subsequent purchasers within the five-year warranty period, meaning that the implied warranty also follows the emissions warranty. Notwithstanding this, privity is not required in this case because West Lumber and the Pennsylvania Class members are intended third-party beneficiaries of contracts between MFTA and its dealers; specifically, they are intended beneficiaries of Defendant's implied warranties. The warranty agreements were designed for and intended to benefit the ultimate consumers only.

314.   As a direct and proximate result of Defendant's breach of warranties, West Lumber and the Class were caused to suffer economic damage, including loss attributable to the loss of their warranty investment value, the diminished value of their Engines, loss of use, as well as the monies spent and to be spent to repair and/or replace their Engines.

## JURY DEMAND

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiffs demands a trial by jury for all issues so triable.

Dated: October 19, 2016          **SHEPHERD, FINKELMAN, MILLER
                                   & SHAH, LLP**

                                  s/James C. Shah_____
                                  JAMES C. SHAH
                                  NATALIE FINKELMAN BENNETT
                                  475 White Horse Pike
                                  Collingswood, NJ  08107

Tel: (856) 858-1770
Fax: (866) 300-7367
E-mail:   jshah@sfmslaw.com
          nfinkelman@sfmslaw.com

Michael D. Donovan
**DONOVAN LITIGATION GROUP LLC**
1055 Westlakes Drives, Suite 155
Berwyn, PA  19103
Telephone:  (610) 647-6067
E-mail: mdonovan@donovanlitigationgroup.com

Robert W. Murphy
**ROBERT W. MURPHY**
1212 S.E. 2nd Avenue
Fort Lauderdale, FL  33316
Tel: (954) 763-8660
Fax: (954) 763-8607
E-Mail:  rwmurphy@lawfirmmurphy.com

Marc A. Goldich
**AXLER GOLDICH LLC**
1650 Market Street, Suite 3600
Philadelphia, PA 19103
Tel: (267) 207-2920
Fax: (267) 319-7901
Email: mgoldich@axgolaw.com

*Attorneys for Plaintiffs and the Class*