# Exhibit 6

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| Q+ FOOD, LLC, LAWRENCE BARTON d/b/a LEGEND MEATS, LLC; ENCORE PIANO & ORGAN MOVING, LLC; ALL AMERICAN MOVING AND STORAGE DELIVERY, LLC, and WEST LUMBER & BUILDING SUPPLY CORP; individually and on behalf of all others similarly situated,<br><br>              Plaintiffs,<br><br>v.<br><br>MITSUBISHI FUSO TRUCK OF AMERICA, INC.,<br><br>              Defendant. | CIVIL ACTION NO. 14-cv-06046-MAS-DEA |

## DECLARATION OF JOYELLE FLEITES IN SUPPORT OF PLAINTIFF'S MOTION FOR PRELIMINARY APPROVAL OF CLASS ACTION SETTLEMENT

THE UNDERSIGNED, Joyelle Fleites, hereby declares, pursuant to 28 U.S.C. §1746, as follows:

1.     I am the President and Chief Operating Officer of Q+Food, LLC, a Florida limited liability corporation ("Q+"), one of the named Plaintiffs and Class Representatives in the above captioned case.

2. I submit this Declaration in support of Plaintiffs' Motion for Preliminary Approval of Class Action Settlement concerning class action styled "*Q+Food, LLC, et al. v. Mitsubishi Fuso Truck of America, Inc.*" ("Mitsubishi Truck Class Action").

3. Mitsubishi Truck Class Action involves claims brought on behalf of Q+ and all others similarly situated for the manufacture of defective commercial trucks manufactured by Mitsubishi Fuso Truck of America, Inc. ("MFTA") as further detailed by the experience by Q+ described below.

4. Q+ is a Florida limited liability company, wholly-owned by myself and Eduardo Fleites.

5. Q+ is in the business of wholesale seafood sales and delivery and maintains its principal place of business at 820 N.E. 42nd Street, Fort Lauderdale, Florida.

6. Q+ purchased a new 2012 Mitsubishi FE125 commercial truck, VIN: JL6AME1A5CK0000587 ("Q+ Truck") on July 22, 2011 from an authorized Mitsubishi dealer, Tri-County Truck & Equipment, Inc. in Pompano Beach, Florida ("Tri-County").

7. Within the first month of the purchase, on August 22, 2011, the Q+ Truck shut down completely and failed to regenerate, requiring towing service by

2

Tri-County to make the truck operable. Q+ Truck was not available until August 24, 2011.

8. On September 6, 2011, the same defect manifested in the Q+ Truck, again requiring service to make the truck operable. The truck was not available to Q+ until September 13, 2011.

9. On October 4, 2011, and the mileage at 7,070, the same emission system defect occurred again, also requiring service to make the Q+ Truck operable. The Q+ Truck was not available until October 11, 2011.

10. On June 13, 2012, the check engine light went on indicating that the selective catalytic reduction ("SCR") was "out-of-perimeter," again requiring service by Tri-County.

11. On July 12, 2012, the check engine light again stayed on due to an "inoperable crankcase pressure sensor." Service was again required, where Tri-County "had to manually generate [] DPS system 3 times." The truck was not available to Q+ until July 23, 2012.

12. On August 13, 2012, the check engine light again stayed on due to a "internal defect with the catalytic converter muffler." The truck was not available to Q+ until August 14, 2012.

3

13. On April 11, 2013, the check engine light again stayed on, requiring replacement of the "mass air flow sensor and injector line." The truck was not available to Q+ until April 29, 2013.

14. On July 18, 2013, the DEF light came on, requiring a "close internal" and manual regeneration. The truck was not available to Q+ until August 6, 2013.

15. On November 26, 2013, the check engine light came on and the truck shutdown, requiring a tow to the dealer for service. The technicians "found DEF internal sensor failure . . . DEF injector crystalized clogged . . . temp gauge failed . . . harness shorted." The truck was not available to Q+ until November 30, 2013.

16. On April 2, 2014, Q+ had routine and scheduled maintenance and service performed on the truck by the MFTA's authorized dealer.

17. On June 11, 2014, the check engine light went on, requiring manual regeneration, with the technician noting that the "unit may need turbo." The truck was not available to Q+ until June 12, 2014.

18. On June 14, 2014, the check engine light went on, but MFTA's authorized dealer could not diagnose the problem, so Q+ retrieved the vehicle on June 17, 2014.

19. On June 21, 2014, the truck would not shift and was locked down. The authorized dealer found that "unit needs a NOx sensor" and manual regeneration. The truck was not available to Q+ until July 8, 2014.

20. In addition to the foregoing repairs and out-of-service periods, the truck was also out-of-service for three (3) recalls required by MFTA: the first on November 28, 2012 – for "engine EEC reprogramming," "Duonic TCM reprogramming," "fuel pressure low return hose," and other matters – taking the truck out-of-service until December 18, 2012; the second on May 29, 2013 – for "EEC reprogramming" – taking the truck out-of-service until June 18, 2013; and the third on April 17, 2014 for "Duonic ATF contamination recall," taking the truck out-of-service until May 31, 2014.

21. On July 30, 2014, in response to Q+'s repeated notices and complaints, Joseph P. Watkins, Product Support Manager of MFTA in Logan Township, NJ, sent Declarant an email in which he stated, among other things, that "we [MFTA] have come to the determination that no further assistance will be provided at this time."

22. After being advised by MFTA that MFTA would not take any further action to remedy the defects in the Q+ Truck, Declarant consulted with counsel, Robert W. Murphy, Esquire ("Attorney Murphy"), who advised me of the rights of Q+ under federal and state warranty law. After recognizing that MFTA had placed into commerce numerous trucks having similar defects as the Q+ Truck, I decided to bring a claim for class-wide relief against MFTA on behalf of Q+ and all persons similarly situated who purchased or leased a defective truck from MFTA.

5

23. In furtherance of my retention of Attorney Murphy to represent me as Class Representative, I reviewed in detail with Attorney Murphy the duties of a Class Representative to the members of the Class under the Federal Rules of Civil Procedure.

24. In acknowledgement of my duty to act as a Class Representative of the instant action, I executed a Statement of Duties to the Class ("Class Representative Statement"), a copy which is attached hereto and incorporated herein as Exhibit "A."

25. I understand that the Class Representative Statement and have agreed to comply with the provisions therein.

26. In furtherance of the efforts to obtain class for relief, I have assisted Attorney Murphy and Co-Counsel, James Shah, Michael Donovan and Mark Goldrich (collectively "Class Counsel") in the prosecution of this action. The efforts have included, among other things, numerous office and telephone client conferences with Class Counsel and organizing the records for Q+ with respect to the repairs for the Q+ Truck and to document the damages sustained by Q+. With respect to the latter activity, I prepared multiple large binders which detailed the numerous repair attempts by MFTA as described above.

27. On November 22, 2015 and on May 31, 2016, I personally attended mediation conducted with the Honorable Edward A. Infante (retired) at JAMS in

6

San Francisco, California. With respect to both trips to San Francisco, I paid for my own travel expense, including airfare, lodging and food, which totaled approximately $1,995.00. Additionally, with respect to the two additional mediation sessions, I was available by telephone to discuss the settlement with Class Counsel, as necessary.

28. Since the Mitsubishi Truck Class Action was initiated, Q+ has retained the truck to preserve same as evidence and for inspection by MFTA. During the past two years, Q+ has not used the truck, except in limited circumstances as a replacement vehicle for another truck. Q+ has made monthly payments of $1,200.00 on the installment loan for the truck, despite the fact that Q+ was not using the truck. With depreciation, Q+ has incurred approximately $20,000.00 in losses in order to preserve the truck for use in litigation.

29. Following the last mediation, the parties continued settlement negotiations for several months while the specific terms for the Class benefits and administration were negotiated. After several more weeks of negotiation, a Class Action Settlement Agreement ("Settlement Agreement") was reached between the parties, which provided for benefits for all persons who had the same experience with respect to defective trucks manufactured by MFTA.

30. I understand the material terms of the Settlement Agreement includes:

      a.    <u>Settlement Fund</u> – that MFTA will establish a settlement fund of $17,500,000.00 to pay monetary benefits to Settlement Class Members, after payment of attorney's fees, settlement administration expense and other related charges. The distribution to Settlement Class Members will depend on the number of "qualified repairs" during the ownership period of the Settlement Class Members.

      b.    <u>Buy-Back Option</u> – that in addition to monetary payment, a Settlement Class Member who currently owns or leases a subject vehicle, and who has had 9 or more qualified repairs, and a mileage of at least 110,000 miles and has not had an emissions recall performed, may request that the vehicle be bought back for fair market value.

      c.    <u>Attorney's Fees, Costs and Other Expenses</u> – that Class Counsel seek an award of attorney's fees of up to a maximum of 25% of the Settlement Fund, plus reimbursement of reasonable expenses not to exceed $100,000.00.

31.    I understand that the Settlement Agreement provides that I will receive Thirty Thousand Dollars ($30,000.00) as compensation for my services ("Representative Compensation"). I understand that the Representative Compensation is subject to approval by the Court in its sound discretion.

32.     Based on the information made known to me concerning the issues in the Mitsubishi Truck Class Action, including defenses of MFTA, I believe that the Settlement Agreement is in the best interest of the Class and should be approved.

I DECLARE UNDER PENALTY OF PERJURY THAT THE FOREGOING IS TRUE AND CORRECT.

Executed this __31__ day of August, 2016 in Fort Lauderdale, Florida.

_____
JOYELLE FLEITES

# EXHIBIT "A"

# ROBERT W. MURPHY
**Attorney at Law**
1212 S.E. 2nd Avenue
Fort Lauderdale, Florida 33316

Email: rwmurphy@lawfirmmurphy.com

Member of the
Florida & Georgia Bar

Telephone: (954) 763-8660
Fax: (954) 763-8607

## STATEMENT OF DUTIES TO THE CLASS

THE UNDERSIGNED understands that my case may be filed as a class action and that if I am a named plaintiff on the Complaint, I will owe a fiduciary duty to the class, must be loyal to the class and take action in the best interest of the class, not my own self interest. After a complaint alleging class action claims is filed, I realize that one or more defendants may try to "bribe" me, or "pay me off" individually in an effort to determine if I am willing to "sell out" the class members I seek to represent. I am telling my attorneys now that I understand that I must protect the interest of those I represent and that I do not expect any preferential treatment or gain at the expense of other similarly situated class members.

My attorneys are specifically instructed to refuse to accept any individual offer of settlement to me during the period of time this case remains a class action or has not had the class certification issue resolved. As long as this case remains a class action, or an appeal is pending from a denial or approval of class action certification, I will unilaterally reject any offers that defendant should make to be in an effort to induce me to abandon the class, and my attorney is instructed to communicate the rejection to the attorneys for the defendant.

I understand that if this litigation is successful as a class action, the Court may award an incentive fee to me if it is appropriate. However, no representations or promises with respect to any incentive fees have been made to me by any person.

I understand that my attorneys will be advancing costs and litigation expenses, payable from

my recovery. I understand that I am responsible for my *pro rata* share of any costs.

Finally, if and when the time arises that an individual offer should be considered by me, my Attorney will advise me of that fact, and will explain to me the reasons why individual settlement is appropriate.

EXECUTED on this 26th day of Aug, 2014.

Q PLUS FOOD, LLC

By: _____
JOYELLE CHUANG, President. Partner
Joyelle Yun-Hsuan Fleites

_____
ROBERT W. MURPHY, ESQUIRE
1212 S.E. 2nd Avenue
Ft. Lauderdale, Florida 33316
(954) 763-8660 (Telephone)
(954) 763-8607 (Fax)

DONOVAN AXLER

By: _____
MICHAEL D. DONOVAN, ESQUIRE
1845 Walnut Street, Suite 1100
Philadelphia, Pennsylvania 19103
(215) 732-6067 (Telephone)
(215) 732-8060 (Fax)

Client  RWM  MDD

2